The United States, Appellants, *v.* Michael Moore.

An historical account given as to what officer in Louisiana possessed the power to grant part of the king's domain.

In September, 1797, Morales, who was intendant, had not the power. And a receipt, of that date, given by him for the purchase-money of lands sold, could convey no title.

By the regulations of O'Reilly, made in 1770, the front proprietors of land upon the Mississippi were bound to make mounds or levees, and also to clear and ditch the whole front of the depth of two arpents, within three years from the date of their purchases. In default thereof, the land reverted to the king.

This condition not having been complied with in the present case, and the alleged proprietor not having asserted any claim from 1797 to 1835, the presumption is that he surrendered his purchase and had his money refunded.

The claim is also barred by lapse of time.

The District Court decreed that "in case any of the lands claimed by the petitioner should have been sold by the United States, he, the petitioner, should be authorized to enter, in any land-office in the State of Louisiana, a like quantity of public lands."

This decree was erroneous. The act of 1844 revived the act of 1824, but did not revive the act of 1828; and the act of 1824 required the grantees of the United States to be made parties in order that they might come in and defend their title. It also intended that these grantees should produce their titles, so that the court might ascertain their boundaries and quantities, and decree accordingly. But in the decree in question, this was not done.

This was an appeal from the District Court of the United States, for the Eastern District of Louisiana.

The act, approved 17th June, 1844, [4 Stat. at Large, p. 676,] revived and continued for five years, and extended to the State of Louisiana the expired act of 26th May, 1824, entitled "An act enabling the claimants to lands within the limits of the State

18 *

of Missouri and Territory of Arkansas to institute proceedings to try the validity of their claims." 4 Stat. at Large, p. 52.

Under this act, Michael Moore presented his petition to the District Court of the United States for the District of Louisiana, on the 17th June, 1846, claiming sixty thousand arpents of land situated in the District of the Atchafalaya, in the sharp end of land or angle where the Atchafalaya and Mississippi Rivers join, or the point formed between the said rivers at the place the Atchafalaya leaves the Mississippi.

The title presented by the petitioner was the following:

### No. 2.—*Sale of Royal Lands; page* 31.

Don Juan Ventura Morales and Don Gilberto Leonard, intendant and comptroller, *pro tempore* of the Province of Louisiana.

We have received from Don Antonio Iriarte twenty-four thousand bits (12½ cts. each,) for the value of sixty thousand superficial arpents of land, at the rate of five cents per arpent, which land has been sold to him for amount of the royal treasurer in the district of country of Chafalaya and the Mississippi, on the point where the two unite; which payment is entered in folio 31 of the journal of this treasury department, and seven hundred and eight bits, (12½ cents each,) the amount due for the two and a half per cent. for the duty of half-yearly tribute, and eighteen per cent. for the transportation of said half-yearly tribute to Spain, have also been paid, as shown by the amount below, namely:

|  | Bits. | Bits. |
|---|---|---|
| For the value of said land, | 24,000 | |
| The half-yearly tribute, and eighteen per cent. for its transportation to Spain, | 708 | |
|  | | 24,708 |

New Orleans, 11th September, 1797.

(Signed)         Morales.
             Leonard.
             Valdes.

On the 8th of January, 1835, Don Roque Moreno, then residing in Madrid, purchased the claim from Don Antonio Iriarte for fifty thousand bits (12½ cents each); and in order to obtain a formal transfer of the title, he presented a petition on the 17th of February, 1835, to the Lieutenant Mayor of Madrid, requesting that the acknowledgment of Iriarte to the transfer might be made in due form. Accordingly, Iriarte appeared before the Lieutenant Mayor, and acknowledged the deed in the presence of three notaries.

In 1838, Roque Moreno wrote several letters to the house of Rosendo Fernandez & Co., at Havana, requesting them to sell the claim, and in May indorsed the document to them for this purpose by the following order:

" Pay to the order of Messrs. Don Rosendo Fernandez & Co., the value of the document hereto annexed, for value in account with said gentlemen.                          ROQUE MORENO.
"Madrid, 27th May, 1838."

On the 15th of September, 1838, Fernandez & Co. assigned the documents. to Cuesta, who transferred them to Moore, the petitioner, as appears by the following transfers.

" Agreeably to a letter from Don Roque Moreno, of 28th of July last, we transfer the above documents to Don Antonio Garcia Cuesta, or order, without any recourse whatsoever against us.                          R. FERNANDEZ & Co.
" Havana, 15th September, 1838."

" I hereby assign, transfer, and convey to Michael Moore, all my right, title, and interest, and the interest of Roque Moreno and R. Fernandez & Co., to the foregoing title, and to the sixty thousand arpents of land herein mentioned.
                          ANTONIO GARCIA CUESTA."

The petitioner, Moore, also, presented in evidence the following letter from Leopold O'Donnell, Governor and Captain-General of the Island of Cuba, verified by Robert B. Campbell, Esq., consul of the United States at Havana.  The letter was addressed to the Spanish consul at New Orleans.

" In my official letter of the 22d of February, I communicated to your Excellency what follows:
" His Excellency the Intendant of the Army, Sub-Intendant-General, and Delegate of the Royal Treasury of this city, in his official letter of the 18th of this month, communicates to me what follows:
·" ESTEEMED SIR, — In order to be able to answer your official letter of the 8th inst., in which you inclosed me a letter from the consul of her Majesty in New Orléans, asking certain information, I sent said letter to the general archives of the royal treasury, and have obtained the following information.  At folio 31 of the book (journal) of the Comptroller for the Army and Department of the Royal Treasury for the Province of. Louisiana, for the year 1797, is an entry, of which what follows is an exact copy:

" September 11th. We have received from Don Antonio Iriarte twenty-four thousand bits, for the value of sixty thousand superficial arpents of land, at the rate of five cents per arpent, which land has been sold to him for amount of the royal treasury, in the district of country of Chafalaya and the Mississippi, on the point where the two unite; and the seven hundred and eight bits, for the balance due for the duty of 2½ per cent. for half-yearly tribute on the value of the land, and eighteen per cent. for the transportation of said half-yearly tribute to Spain, have also been paid, as appears by the account below:

For the value of said lands, . . 24,000 bits.
The half-yearly tribute, and 18 per
    cent. for its transportation to Spain,   708 .
                       ——— 24,708 bits.
              MORALES, LEONARD, VALDES.
Antonio Iriarte, 24,708 bits.

" This is all that appears in relation to the transfer which the Spanish government made in Louisiana to Don Antonio Iriarte, of the 60,000 arpents of land of which mention is made in the official letter of his Excellency the Captain-General, and also in the letter of the consul of her Majesty at New Orleans, inclosed therein; whether it be in consequence of the documents appertaining to the subject-matter not having been transferred to this office, now under my charge, or whether they were among those which have been lost on the way to this island, or of those which were destroyed by the moths and humidity in the place where they had been deposited since they were received here; neither can be found the decree or copy issued by the tribunal of this intendancy, ordering to be made out the calculations of the amount to be paid by the purchaser for said land; and consequently this office cannot give any thing more than what has already been stated in relation to the boundaries, dimensions of the land, or furnish any thing by which the parties interested may do so. The above is in answer to your letter above mentioned, and I transmit this information to you for your knowledge; and in answer to your letter of the 25th of last month having reference to this subject.

" I transmit to you the above information, in case the first communication of a similar nature should have been mislaid or lost.

" May God preserve you many years.
                        LEOPOLD O'DONNELL.

" Havana, 11th April, 1845."

Several witnesses were examined on behalf of the petitioner,

who verified the signatures of Rosendo Fernandez & Co., of Roque Moreno, of Morales, Leonard, and Valdes. One of the witnesses, Charles Louis Blacke, being shown the orginal document, said, " Cannot explain why the document A is cut, as it appears to be; believes that it must have been done in wantonness. States that documents in the intendancy department were never cut in that way."

Jose Martinez del Campo, witness for plaintiff, being recalled, states, that the discolored appearance of the paper, the document A, in his opinion, arises from certain things, which he states as follows: That the officers of quarantine in Spain, in order to prevent the spreading of infectious diseases, immerse documents in vinegar, and cut them in the manner of the document A in question, in order to make the vinegar penetrate more easily. This, he thinks, has been the case with the document A, and therefore, its discolored and cut appearance.

States, that all the documents from Spain are cut in like manner; that he has often seen them; he has in his possession letters cut in the same way.

The petitioner also offered evidence to prove the genuineness of the letters from Roque Moreno, above mentioned.

The District Attorney put in a general denial, on the part of the United States, and offered sundry original documents in evidence to show Morales's habitual mode of signing officially, and also Leonard's mode of signature.

At May term, 1848, the cause came on for trial before the District Court; the petitioner having entered a disclaimer as to the lands claimed by Butler and Black, confining his claim, as to them, to a float from the United States. The following is the decree of the District Court:

" It is hereby ordered, adjudged, and decreed, that the petitioner, Michael Moore, is the true and lawful owner of, and has good title against the United States, the defendants, in and to all the lands and hereditaments claimed by him in his petition, to wit, to sixty thousand superficial arpents of land, situated in the State of Louisiana, between the rivers Mississippi and the Atchafalaya, in the angle formed by the said two rivers, commencing at the point where the Atchafalaya River leaves the Mississippi, and running down between the two rivers, with the said rivers as boundaries on two sides, for the above quantity.

" It is further ordered, adjudged, and decreed that, in case said lands, so claimed by said petitioner, or any part or portion thereof, shall have been sold by the United States, or otherwise disposed of, said petitioner, Michael Moore, shall be, and is hereby, authorized to enter in any land-office in the State

of Louisiana, in parcels conformable to sectional divisions and subdivisions, a like quantity of public lands, after the same shall have been offered at public sale.

"And it further appearing that Thomas Butler and John Black hold their lands by title acquired from the United States, it is ordered, adjudged, and decreed, that they be quieted in their titles, and that the petitioner recover nothing from them.

"And that judgment, *pro confesso*, be entered against John Hagan, Charles W. Hopkins, and H. L. Williams, A. Ledoux, and A. Miltenberger, they not having answered the petition filed in this case.

"Judgment rendered June 28th, 1848.

"Judgment signed June 30th, 1848.

(Signed)     Theo. H. McCaleb,    [Seal.]
*United States Judge.*"

From this decree, the United States appealed to this court.

It was argued for the appellants by *Mr. Crittenden*, Attorney-General, who insisted that the claim was fraudulent and void.

1. The claim is not founded on any grant, concession, warrant, or order of survey; and so not within the statute which authorized claimants to institute suits against the United States.

It is simply a receipt for money paid into the treasury of Spain by Iriarte, for land which he desired to purchase; the description of the land is the sole act of Iriarte himself, not founded on any previous act of the officer of Spain for the Province of Louisiana, who was authorized to make grants, concessions, warrants, and orders of survey; nor is it sanctioned and ratified by any subsequent act of grant, concession, warrant, or order of survey, to define the boundaries and sever the land from the public domain. By our own laws, any person may deposit in the treasury of the United States, for the purchase of the land he desires to make, and take the treasurer's receipt therefor. But that receipt confers no right or interest in the land which is described by the depositor. He must thereafter apply to the proper officers of the United States, who are intrusted by law to make sales of the public lands and carry them into grant. It would not do for such depositor to stop at his deposit of money in the treasury, omitting all the subsequent means required by law, in order to obtain a title to the lands mentioned in the treasurer's receipt. If such a depositor should hold such a receipt for thirty or forty years, and then claim the land mentioned in the receipt, his claim would be pronounced ridiculous and absurd.

The claim of Moore, founded upon the simple receipt produced, unaccompanied by any authoritative act, previously or subsequently had and done, to signify a grant, concession, warrant, or order of survey, is ridiculous and absurd. The letter of O'Donnell, Governor and Captain-General of Cuba, introduced by the petitioner, shows that the receipt is not of itself a grant, concession, warrant, or order of survey.

2. The petition contains no excuse whatever; no reason for the delay, for the laches and neglect, for the length of time during which Iriarte and those claiming as assignees under him have slept upon this receipt, without claim, enjoyment, or effort to enjoy the land claimed under it.

The petition, by the express command of the statute under which it was filed, is to be governed and conducted according to the rules of a court of equity. And, as the bill alleges no excuse for the great laches, inactivity, and neglect, it is bad upon general demurrer. Bowman & others v. Wathen & others, December term, 1843, 1 Howard, 193; Maxwell v. Kennedy's Heirs, December term, 1840, 8 Howard, 221, 222. In these two cases various decisions upon the subject are cited.

From 11th September, 1797, to the filing of this petition, on 17th June, 1846, (a period of forty-eight years and more,) this claim slept, without any attempt to obtain a survey, without any possession, without any claim known or heard of in Louisiana. It was first stirred in Madrid, in the year 1835, by Moreno; sent to Havana, and passed from hand to hand there, until Michael Moore became assignee, without date, and asserted the claim in the year 1846.

That this receipt was suffered to sleep for such a great length of time, without one single effort to obtain the land, lays the foundation for the legal presumption that it has been in some way compensated and cancelled. Its discolored, cancelled, cut, and carved condition is but ill accounted for by the witness Campo, who seems not to understand the meaning of quarantine. This document, A, was in Madrid, and upon the petition of Moreno, was there assigned and acknowledged by Iriarte; certified there; thence inclosed in a letter by Moreno to Fernandez & Co., at Havana, and never returned to Spain. That documents sent *from* Spain should, by "the officers in quarantine *in Spain*," be immersed in vinegar, and cut to make the vinegar penetrate more easily, "in order to prevent the spreading of infectious diseases," is reversing the order and regular course of things. Vessels arriving in Spain are subjected to quarantine by the officers of quarantine in Spain. But that the officers in Spain should immerse in vinegar, and cut, to make the vinegar penetrate more easily, this receipt to be sent from Spain, and

that " all the documents from Spain are cut in like manner," is a tale not credible because of the swearing of Jose Martinez del Campo.

Iriarte was resident in Louisiana at the date of the receipt, and for years after.  If in the beginning the receipt was true, good, and effectual, and had not, by some after transaction, become of no effect, why did Iriarte, from 1797 to 1835, sleep upon his right, neglect to pursue his claim, and totally fail to seek the enjoyment of that which was his own ?

The legal presumption in courts of law and in courts of equity, arising out of such laches, inactivity, and supineness for such a great length of time, is that this receipt may have been for a bill, order, or note never paid ; or that the money had been withdrawn from the treasury ; or that the half-yearly tribute of two and a half per cent. upon the value of the land, and eighteen per cent. for transporting it to Spain, was found too onerous by Iriarte, and therefore he abandoned his claim to the land, refused or neglected to pay the half-yearly tribute, cancelled his intended purchase, or refused to complete it ; or that, by some means or other, now forgotten in the lapse of such a great number of years, this receipt was compensated, extinguished, and abandoned.

That legal presumption " stands upon a clear principle, built upon reason, the nature and character of man, and the result of human experience.  It resolves itself into this, that a man will naturally enjoy what belongs to him."

" Upon the weakness and infirmity of all human tribunals, judging of matters of antiquity, where the circumstances are incapable of raising any thing like belief, instead of belief, (which is the foundation of the judgment upon a recent transaction,) the legal presumption holds the place of particular individual belief."

" Mankind, from the infirmity and necessity of their situation, must, for the preservation of their property and rights, have recourse to some general principle to take the place of individual, specific belief."

After twenty years, this presumption will hold unless repelled by something to excuse and account for the failure for so many years to seek to enjoy what is his own.   Hillary *v.* Waller, 12 Vesey 265, 266.

3  This petition was not presented to the court within the two years prescribed by the statute under which it professes to have been filed.

4. The description of the land mentioned in the receipt is too vague and indefinite.

As these, two last points are not involved in the opinion of the

court, the arguments of the Attorney-General in support of them are omitted.

Mr. Justice CATRON delivered the opinion of the court.

The petition states, that about the 11th September, 1797, Antonio Yriarte, a resident of the Province of Louisiana, for the sum of 24,708 reals by him paid, purchased from the proper authorities under the government of Spain, to wit: Juan Ventura Morales, the Intendant of the Province of Louisiana, and Gilbert Leonard, the Treasurer of said Province, sixty thousand arpens of land, &c., all of which more fully appears from the annexed certificate, signed by the said Morales, Leonard and Carsetano Valdes, secretary of the Intendant, acknowledging the receipt of the consideration and the sale of the land above expressed.

The first question arising on this statement of facts is, whether the paper exhibited affords any evidence that the " proper authorities" of Spain sold the land to Yriarte, as this party can only sue for lands claimed by virtue of any French or Spanish grant, concession, warrant, or order of survey, " legally made."

His petition alleges that the land was purchased on the 11th September, 1797, from Morales, the Intendant, and Leonard, the Treasurer of the Province. The act positively requires that the date of the sale, concession, &c., shall be set forth, and by whom it was made, in order that it may be seen whether the officer making the concession, or sale, had power to do so, at the time it was done; and here, the question of power existing in the Intendant is raised by an allegation of the fact, and a denial in the answer. Undoubtedly, Leonard had no authority to sell, or distribute by donation, any part of the public domain; but this would be of no consequence if Morales had such power. When the paper exhibited bears date, a controversy existed between the Intendant Morales and the political and military Governor of Louisiana, as to which of them appertained the power to sell and distribute the King's domain, the Intendant claiming authority under the laws of the Indies, and the Governor relying on a royal order of August, 1770. The following historical account will best explain how the matter stood in 1797, when (as is alleged) this sale was made.

O'Rielly, by commission dated 16th April, 1769, was appointed Governor and Captain-General of Louisiana, with " special power to establish in this new part of the King's dominions, with regard to the military force, police, administration of justice and finances, such a form of government as might most effectually secure its dependence and subordination, and promote the King's service and the happiness of his subjects. 2 Mart. 2.

Unzaga, colonel of the regiment of Havana, who had come with O'Rielly, had a commission as Governor; but was not authorized to enter upon his duties until the departure of O'Rielly, or the declaration of his will. On the 1st December, 1769, O'Rielly made the declaration, and Unzaga assumed the functions of Governor. 2 Mart. 13.

On the 18th February, 1770, O'Rielly made the regulations relating to the granting of land, known by his name. The 12th article declares that all grants shall be made in the name of the King by the Governor-General of the Province. 2 White's Recop. 230.

A royal order of the 24th August, 1770, states, that O'Rielly had communicated the regulations made by him to his government, and these declaring that the granting of land had been confided by His Majesty to the Governor and Comisario Ordenador, he considered it would be better in future, that the Governor alone should be authorized by His Majesty to make those grants. The order to the Governor then proceeds: " The King having examined these dispositions and propositions of the said Lieutenant-General, approves them, and also, that it should be you and your successors in that government only, who are to have the right to distribute the royal lands, conforming in all points, as long as His Majesty does not otherwise dispose, to the said instructions, the date of which is 18th February of this present year." 2 White's Recop. 460.

The Governors who succeeded Unzaga were, Galvez, colonel of the regiment of Louisiana, to whom Unzaga, when he was appointed Captain-General of the Caraccas, was directed to surrender the government provisionally, by a *cedula* of 10th July, 1776. Galvez entered on the duties of his office 1st January, 1777. 2 Mart. 39.

Miro succeeded Galvez; the government of the province being provisionally vested in him on the departure of Galvez in 1782. 2 Mart. 68.

Carondelet was promoted from the government of San Salvador, and entered on his duties 1st January, 1792. 2 Mart. 81.

Gayoso, the commandant at Natchez, succeeded Carondelet in the beginning of 1797. 2 Mart. 149. His regulations for the administration of posts and distribution of lands, are dated 9th September, 1797.

So far as we have seen, the exclusive authority vested in the Governors to make grants, stood unrevoked up to this time. But on the departure of Rendon, who had been Intendant in 1796, the functions of Intendant devolved on Morales, who had been contador. 2 Mart. 131. Morales, thus Intendant *ad interim*, in a letter to Governor Gayoso of the 29th August, 1797,

(a few days before the latter issued his regulations,) claimed the right to grant the lands. 2 White's Recop. 470. Gayoso declined to yield, but " resolved to submit the question to higher authority, and to allow no innovation until the resolution of His Majesty be made known." 2 White, 470, 471. Morales also wrote a long letter to Spain on the subject.

A royal order of 22d October, 1798, addressed to Gayoso, states the receipt of his and Morales's communications " respecting the right of granting and distributing royal lands in the district under your command, which right has been vested in the political and military Governor since the order of August 24, 1770," and proceeds thus : " The King has resolved for the sake of the better and more exact observance of the 81st article of the royal ordinance for Intendants of New Spain, that the exclusive faculty of granting and distributing lands, of every class, shall be restored to the Intendancy of the province, free from the interference of any other authority, in the proceedings as established by law, consequently the power hitherto residing in the government to those effects is abolished and suppressed, being transferred to the Intendancy for the future." 2 White's Recop. 478.

The royal order was communicated from Spain to Morales on the same 22d October, 1798. In the communication to Gayoso, and that to himself, Morales is styled Intendant *ad interim.*

The royal order seems to have reached Morales in February, 1799, before it did Gayoso. Some correspondence then took place between them, and Morales became vested with the power of making sales and grants. 2 White, 478 – 484. He issued his regulations 17th July, 1799. Ib. 234.

It will thus be seen, that the authorities in Spain considered the royal order of 24th August, 1770, as of force up to February, 1799. The language is too plain to admit of a doubt. The preamble of Morales's own regulations states, that the power to grant was vested in the military and political government, from 24th August, 1770, to 22d October, 1798.

To the same effect is the report of Pintado, dated at Havana in 1822, respecting lands in Florida, communicated to our government. 2 White's Recop. 339. See, also, 2 Mart. 158.

At the date of the receipt to Yriarte, 11th September, 1797, the question between Gayoso and Morales had not been settled by the king. In fact, it was only a few days after he had addressed the first letter to Gayoso on the subject.

In the correspondence of Morales with Gayoso and the authorities in Spain, he refers to the eighty-first article of instructions to Intendants, as giving some foundation for his claim. The instructions were dated in December, 1787. 1 White's

Recop. 360. They will be found more at length in 2 White, 67, and it will be seen to apply only to twelve intendancies thereby created and expressly named in New Spain; it did not apply to Louisiana. This article seems not to have been sent to Louisiana, or been known there until Morales brought the question up in 1797. The royal order of 1798, transferring the power to distribute the land for the future, is conclusive that the eighty-first article had no application to Louisiana.

Some of the Governors acted also as Intendants; but that would not alter the power conferred. It was in their capacities as governors they were authorized to make grants, and not as superintendents of the finances.

The first Intendant seems to have come to the country with O'Reilly. His name was Francisco de Loyola. 2 Mart. 2. He died in 1670, and was succeeded by Gayarre, as Intendant, *ad interim*. 2 Mart. 21.

Unzaga had the office of Intendant united to that of Governor. 2 Mart. 34. Galvez, when appointed Governor, was also appointed Intendant. 2 Mart. 39. During the time he was engaged in the expeditions against the British possessions in West Florida, he had no time to bestow on fiscal affairs, and Martin Navarro was appointed Intendant in the beginning of 1781. 2 Mart. 54. He left the province for Spain in 1788, and the two offices were again united in the person of Miro. 2 Mart. 180. Carondelet was Intendant as well as Governor. 2 Mart. 111. On his representation the office of Intendant was separated from that of Governor, and Francisco de Rendon, who had been the Secretary of the Spanish Legation in the United States, was appointed, and arrived at New Orleans in the beginning of 1794. 2 Mart. 122. Rendon was afterwards sent to Zacatecas, and Morales was appointed *ad interim*, 1796. 2 Mart. 131.

Thus it appears that Morales, in his letter of August 29th, 1797, to Governor Gayosa de Lemos, claimed the right to sell, distribute, and grant the public lands; and insisted that the Governor should not oppose the intendancy in the free and open jurisdiction appertaining to it, and with which no one had a right to intermeddle. And, on the next day, (30th August, 1797) the governor replied that, as discussion of the question would embarrass the King's service, and as the Intendant claimed cognizance of causes respecting sales, agreements, and distributions of royal lands, he resolved to submit the question to higher authority, " and to allow no innovation until the resolution of his majesty be made known."

The Governor having partly shrunk from the contest, it is highly probable that the Intendant did assume to make the sale set forth by the receipt, which bears date twelve days after the

Governor's letter.   As no authority existed in the Intendant to deal with the King's domain from 1769, when Spain first got possession of Louisiana, up to the date of the King's order made in October, 1798, it is manifest that Morales had no power to sell in September, 1797; and there is no evidence that the King sanctioned this sale, nor can it be inferred from any thing appearing in the case.   We think the contrary is apparent.

In 1797, Yriarte resided at New Orleans, and continued in this country for ten years or more, as Blache states, and then removed to old Spain.   He resided at Madrid, when he transferred the receipt to Moreno in 1835.   'Yriarte never took possession of the land claimed, nor did he take any further step to secure the property.

By the regulations of O'Rielly, made in 1770, and sanctioned by the King, Yriarte was compelled, if he was owner, to make mounds or levees in front of his land on the banks of the Mississippi, and also to clear and ditch the whole front of the depth of two arpens within three years from the date of his purchase; and, in default of fulfilling these conditions, the land was to revert to the King's domain and be granted anew.   Neither could he sell until after three years' possession, and until the above-mentioned conditions were entirely fulfilled; and, says the third regulation, " To guard against every evasion in this respect, the sales of said lands cannot be made without a written permission from the Governor-General, who will not grant it, until, on strict inquiry, it shall be found that the conditions above explained have been duly executed."   That is to say, no sale could be made or formal title issued, until these conditions were complied with.

The land claimed fronted on the Mississippi River for twenty miles and more, and on the great western outlet, the Atchafalaya, to an equal extent; and, if no mounds were made, the country below must have been overflowed every year to a ruinous extent.   Levees were indispensable; their construction was a high public policy, and forfeiture an inevitable necessity, in case of failure.   These were laws and ordinances of the government under which the claim originated, and which the act of 1824 instructs us to observe; the Spanish government was not bound to complete the title; but, on the contrary, under a necessity to declare it forfeited.   This is plainly manifest.   Even admitting that Morales, as Intendant, had full power to make the sale, still forfeiture was inevitable.   Under these circumstances it is idle to assume that Morales's act of sale received any sanction from the King of Spain, or from any one exercising his authority.

Embarrassed as Yriarte was with the want of power in Morales to sell, and the stringency of O'Reilly's regulations com-

19*

pelling him to occupy, clear, ditch, and levy, a necessity was imposed on him to surrender his purchase and have his money refunded; and there are several reasons apparent why we think he did so. In the first place, he labored under no disability or impediment; he remained quiet, never took possession, nor asked for a survey up to the change of flags in 1804; nor did he ask for a confirmation of Morales's void act from the Spanish authorities. And, after the United States assumed jurisdiction, boards of commissioners almost constantly existed before which his claim could have been presented, and through them, reported to Congress for political action thereon; yet no step was taken, and the claim slept in the hands of Yriarte until 1835, when he sold it in Madrid; and it first made its appearance in this country, when presented to the District Court, in June, 1846. When there adduced in evidence, the receipt was cut in gashes and stained, having the appearance of a neglected, valueless, and cancelled paper. To account for its appearance, one Campo deposed for plaintiff, that, in his opinion, the cut and dilapidated condition of the document grew out of this fact: " that the officers of quarantine in Spain, in order to prevent the spreading of infectious diseases, immersed documents in vinegar, and cut them in this manner. This was in order to make the vinegar penetrate more easily, and this he thinks has been the case with the document in question, and, therefore, its discolored and cut appearance." He further states, "that all the documents from Spain are cut in like manner; that he has often seen them; he has in his possession letters cut in the same way."

This was obviously a private receipt held by Yriarte, and carried by him to Spain; and as the money he had paid in Louisiana went to the royal treasury and was transmitted to Madrid as the receipt shows, the fair presumption is, that when the receipt was there presented, and the money refunded, the marks of cancellation were made by cutting the paper in gashes, as no reason can be perceived why the holder would thus deface his own document; nor can it be imagined why a mere sheet of paper should be thus cut to let in an acid, if such practice prevailed, which we suppose, however, to have no foundation in fact, as witnesses in abundance could have been produced to support this improbable account, if it were true that all documents, coming from Spain, are cut in like manner and stained with vinegar.

We are called on to decide in this case according to the rules governing a court of equity, and are bound to give due weight to lapse of time.

The party was under no disability, and slept on his rights, as he now claims them, for nearly fifty years, without taking a

single step. He makes no excuse for his long delay, and cannot now get relief by having his title completed.

No case has come within our experience, where the obscurity and antiquity of the transaction more forcibly than in the present case, required a court of equity to bar a complainant, on legal presumptions founded on lapse of time; and where the bar should take the place of individual belief.

The government had taken possession, and had sold out these lands to a great extent, and was bound in good faith to protect its vendees; that these private owners could have relied on the lapse of time, and defeated the claim set up, is clear; and on principle, their vendor could do so likewise.

Even had this claim been adjudged valid by this court, still the decree below is in part erroneous. The part referred to is as follows: "It is further ordered, adjudged, and decreed, that, in case said lands so claimed by said petitioner, or any part or portion thereof, shall have been sold by the United States, or otherwise disposed of, said petitioner, Michael Moore, shall be, and is hereby, authorized, to enter in any land-office in the State of Louisiana, in parcels conformable to sectional divisions and subdivisions, a like quantity of public lands, after the same shall have been offered at public sale."

By the act of 1824, it is provided that if it shall so happen that the lands decreed to any complainant "shall have been sold by the United States, or otherwise disposed of, it shall be lawful for the party interested to enter the like quantity on other lands." Here the decree is general against the United States, and awards to complainant floating warrants for all lands that the United States may have sold, or otherwise disposed of within the bounds of the tract decreed. The act requires the names of all persons claiming the land sued for, or any part of it, to be set forth in the petition, and that they shall be made defendants in due form by citation; and if the entire tract is claimed by private persons, then they shall be sole defendants; but if the government is owner in part, or of the whole, then this fact shall be stated, and the attorney of the district must be served with process, and be allowed to answer for the United States. The purpose of Congress was first, to authorize a suit against the United States; and, in the next place, to give judicial cognizance of a description of incipient claims having no standing in a court of justice before the act was passed; and, thirdly, that the petitioner should be bound to sue private persons, claiming the same land, so that those having an interest, and better knowledge of facts, and more capacity to defend, than the United States, might be drawn into the contest; and that they should be compelled to produce their title, so that if a

decree was made for complainant, the court could ascertain what part of the land should be granted to him by patent; and as this could only be done by a specific ascertainment of interfering claims, the decree must of necessity specify their boundaries and quantities. Nor can it stop here; it must adjudge that a warrant shall issue, and be subject to location. This decree is not only in general terms, but it is contingent, that in case all the lands claimed, or any part or portion of them, have been sold or otherwise disposed of by the United States, then the petitioner shall be authorized to enter a like quantity, &c.

The District Court, as we apprehend, did not proceed to adjudge other lands as an equivalent, on the act of 1824, as it originally stood, but on amendatory and repealing clauses found in the 8th section of the act of May 23d, 1828, extending the law to Florida; and especially to the 2d section of the act of 24th May, 1828, giving further time to claimants in Missouri and Arkansas to institute suits; both of which clauses declare that so much of the act of 1824 as requires petitioners to make adverse claimants parties to the suit shall be, and are thereby repealed. The act of 24th May, 1828, contains various other provisions; some of which modify, and others repeal parts of the act of 1824.

The act of June 17, 1844, provides that so much of the act of May 26, 1824, as relates to the State of Missouri is thereby revived and reënacted; and the same jurisdiction is given to the District Courts of Arkansas, Louisiana, Alabama, and Mississippi, as was exercised under said act in Missouri; with the exception of that part of the act (being sections 14 and 15) that applied exclusively to the territory of Arkansas, which only allowed claims of a league square, and under, to be adjudicated. The thirteen previous sections stand incorporated in like manner as they would be, if they had been copied into the act of 1844. No language to this effect, could make it plainer; any attempt to incorporate likewise the act of 24th May, 1828, into that of 1844, would not only be a forced construction, but a manifest perversion. It follows that the law as found in the thirteen first sections of the act of 1824, furnishes all authority the District Court had, to proceed, and to decree an equivalent; and, that the true mode of proceeding, according to the law as it stands, is as above stated, we suppose to be not open to controversy.

This view of the act of 1844 was very forcibly presented to us by the Attorney-General in the case of the United States v. Boisdore's Heirs, coming up from Mississippi, 11 How. 77, but as we then apprehended that no similar irregularity might again occur, no notice was taken of it in the opinion, dismissing the cause on its merits.

Being of opinion that this cause is destitute of merits, it is ordered that the decree of the District Court be reversed, and the petition dismissed.

### Order.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the Eastern District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said District Court in this cause be, and the same is hereby, reversed and annulled, and that this cause be and the same is hereby remanded to the said District Court, with directions to dismiss the petition of the claimants.