JOHN WEBB, APPELLANT, VS. THOMAS DUNN, ET AL., APPELLEES.

Chapter 3159 of the Laws of 1879, being an act to amend section four of an act entitled an act to establish the office of Harbor Master for the Port of Pensacola, approved December 8, 1866, providing that the Harbor Master may demand, for every vessel that may enter the port and load or unload, or make fast to any wharf, certain fees, whether earned by any service rendered to any such vessel or not, is a law imposing a tax upon such vessels or their owners, and a " regulation of commerce " within the terms of the third paragraph of section eight, Article 1, of the Constitution of the United States, which grants to Congress "the power to regulate commerce with foreign nations, and among the several States," and said act is therefore unconstitutional and void.

Appeal from the Circuit Court for Escambia county.
The facts of the case are stated in the opinion.

46

*J. E. Yonge* and *Geo. P. Raney* for Appellant.

*W. A. Blount* for Appellees.

THE CHIEF-JUSTICE delivered the opinion of the court.

Dunn and Elliot, of Maine, owners of vessels doing business between ports north of Cape Hatteras, on the Atlantic coast of the United States, and Pensacola, brought their bill against Webb, the Harbor Master of the port of Pensacola, to restrain him from exacting certain fees, and from prosecuting certain suits commenced for the purpose of enforcing payment of such fees to which the Harbor Master claimed to be entitled, by virtue of the provisions of Chapter 1620 of the Laws of Florida, passed in 1866, and Chapter 3159, Laws of 1879. The Harbor Master demands for each vessel loading or unloading, or making fast to any wharf, the fees mentioned in the act without reference to whether any services are performed, or whether such services are necessary or required, except the boarding of vessels and tendering such services as he might be called on to perform, and demanding the fees.

The injunction having been granted, Webb, Harbor Master, appeals.

An act to establish the office of Harbor Master for the port of Pensacola, approved December 8, 1866, (Ch. 1620,) provides for the appointment of a Harbor Master, and prescribes his duties. The third section provides that " said Harbor Master, under the rules and regulations to be established by the Board of Port Wardens for the port of Pensacola, shall have authority to regulate and station all vessels in the bay fronting the City of Pensacola and at the whaves thereof, and remove, from time to time, such vessels as are not employed in receiving and discharging their cargoes to make room for such others as require to be

more immediately accommodated for the purpose of receiving or discharging their cargoes," and makes the Harbor Master the umpire to determine the relative rights of position of vessels.

The fourth section, as amended in 1879, (Ch. 3159,) provides " that the Harbor Master shall have power to demand and receive from the commanders, owners or consignees, or either of them, of every vessel that may enter the port of Pensacola and load or unload, or make fast to any wharf, the following fees, viz: For any vessel drawing less than ten feet, the sum of five dollars; and for any vessel drawing more than ten feet, the sum of one dollar for each additional foot: *Provided*, This section shall not extend to flats, keel-boats, steamboats or other vessels regularly employed in the trade between the port of Pensacola and the ports in the States of Alabama, Louisiana and Texas."

It is further (by the act of 1866) made the duty of the Harbor Master to superintend and enforce all laws of the State and of the city for preventing and removing nuisances upon the wharves and water front; and to demand of the captain of every vessel arriving from sea the permit of the resident physician or bill of health, and to report to the Mayor all vessels entering without such permit.

The claim on the part of the complainants is that the act in question, so far as it provides fees to the Harbor Master, to be paid for each vessel from another State which may receive or discharge cargo, or make fast to any wharf in Pensacola, is in violation of Art. I., Section 8, Par. 3, Constitution of the United States, providing that " Congress shall have power to regulate commerce with foreign nations and among the several States;" and of Section 10, of the same article, which prohibits the State, without the consent of Congress, to " lay any duty of tonnage;" and that it is contrary to the rights of the citizens of each State to

enjoy all the privileges and immunities of citizens in the several States guaranteed by Sec. 2 of Art. IV. ; and that it is in violation of Sec. 9, Par. 5, Art. I., providing that vessels bound to or from one State shall not be obliged to enter, clear or pay duties in another.

The power to regulate commerce granted to Congress is necessarily exclusive, and the same power cannot be constitutionally exercised by the States. 14 Peters, 570 ; 5 Wheat., 23 ; 9 Wheat., 196 ; 12 Wheat., 446 ; 15 Peters, 511 ; 11 Peters, 158 ; 7 How., 283 ; 6 Wall., 31 ; 10 Otto, 259.

A tax levied by a law of New York of a given sum upon the master and each of the sailors and passengers of a vessel coming from a foreign port was, under this Federal power to regulate commerce, declared to be unconstitutional and void. The application of the moneys for the support of a marine hospital, and for other purposes, does not affect the principle. "The amount and application of this tax are only important to show the consequence of the exercise of the power of the States. The principle involved is vital to the commercial power of the Union." 7 How., 404.

"Congress possesses the power to regulate commerce with foreign nations and among the several States, and it is well settled law that the word commerce, as used in the Constitution, comprehends navigation, and that it extends to every species of commercial intercourse between the States and foreign nations, and to all commerce in the several States except such as is completely internal, and which does not extend to or affect other States." State Tonnage Cases, 12 Wall., 214.

The case of Steamship Co. vs. Port Wardens, 6 Wall., 31, arose upon a statute of Louisiana enacting that the Master and Wardens of the port of New Orleans should be entitled to demand and receive, in addition to other fees, the

sum of five dollars, whether called on to perform any service or not, for every vessel arriving in that port. Chase, C. J., delivering the opinion of the court, remarks that the power to regulate commerce was given to Congress in comprehensive terms with the obvious intent to place that commerce beyond interruption or embarrassment arising from the conflicting or hostile State regulations. The power to enact inspection laws and some other powers, the exercise of which may, in various degrees, affect commerce, including quarantine and other health laws, laws concerning the domestic police and laws regulating the internal trade of a State, are recognized, however, as within the authority of the State. The pilot laws are expressly recognized by Congress.

The court says: " That the act of the Legislature of Louisiana in question is a regulation of commerce can hardly be doubted. It imposes *a tax* upon every ship entering the port of New Orleans, to be collected upon every entry." It was claimed, however, that this tax was for compensation to the Harbor Master and Wardens, whose duties were defined by the act, but the court say: " There are two answers to this proposition. The first is that no act of Congress recognizes such laws as that of Louisiana as proper and beneficial regulations, while the State laws in respect to pilotage are thus recognized. The second is that the right to recover pilotage and half pilotage, as prescribed by State legislation, rests not only on State laws, but on contract. * * But in the case before us there were no services, and no offer to perform any. The State law is express. It subjects the vessel to the demand of the Master and Wardens ' whether they be called on to perform any service or not.' It may be true that the existence of such a body of men is beneficial to commerce, but the same is true of the government of the State, of the

city government, of the courts, of the whole body of public functionaries. If the constitutionality of the charge the benefit of the Master and Wardens can be maintained upon the ground that it secures compensation for for services, it is difficult to perceive upon what grounds the constitutionality of any State law imposing taxes for the benefit of the State government upon vessels landing in its ports can be questioned.

"We think it quite clear, therefore, that the regulation of commerce made by the act before us comes within none of the limitations or exceptions to the general rule of the Constitution that the regulation of commerce among the States is in Congress." The act of Louisiana was declared void as a tax upon commerce, a restriction upon commercial intercourse; a sovereign exaction and not a charge for compensation; a regulation of commerce, and also a duty of tonnage.

The judgment of the court in Cannon vs. New Orleans, 20 Wall., 577, upon another ordinance of that city charging upon every steam vessel which shall moor or land in any part of the city ten cents per ton for levee and wharfage dues, without reference to whether services were performed or not, was that the ordinance was unconstitutional and void. The court say: "We are of opinion that upon the face of the ordinance itself, * * the dues here claimed cannot be supported as a compensation for the use of the the city's wharves, but that it is a tax upon every vessel which stops, either by landing or mooring, in the waters of the Mississippi river, within the city of New Orleans, for the privilege of so landing or mooring." This is declared to be a duty of tonnage, to be measured by the capacity of the vessel, and the court further remark: "In saying this we do not understand that this principle interposes any hindrance to the recovery from any vessel landing at a

wharf or pier owned by an individual or by a municipal or other corporation a just compensation for the use of the property."

In the case of Inman Steamship Co. vs. Tinker, 4 Otto, 238, the Legislature of New York, by an act defining and regulating the powers, duties and compensation of the Captain of the port and Harbor Masters of New York, had prescribed certain *fees* to be collected from ships or vessels that are permitted to enter the port, or load or unload, or make fast to any wharf therein, at one-half of one cent per ton of U. S. vessels and three cents per ton of foreign vessels, such fees to be computed according to the registered tonnage of each vessel. The act was condemned as an imposition of tonnage duties, and the court remark further that: "In this law of the State there are several points that must not be overlooked. The charge is not exacted for any services rendered or offered to be rendered. * * * * The charge is applied wholly irrespective of the *ad valorem* principle. * * The act makes a discrimination. To one class of vessels it applies the rate here in question, to another class double that rate, and to yet another class none at all. Those belonging to the latter are wholly exempted. * * The tax imposed is not merely a mode of measuring the compensation to be paid. The answer to this suggestion is that it is exacted where there is *nothing to be paid for*, and has no reference to any circumstances in this connection but the tonnage of the vessel and *the class* to which it belongs. The commerce clauses of the Constitution had their origin in a wise and salutary policy. They give to Congress the entire control of the foreign and inter-State commerce of the country."

It will be observed that the act of the New York Legislature is criticised and condemned, not alone because it imposed a duty of tonnage, but that its effect was to levy a

tax, not to pay for services rendered, nor upon any system of equality and uniformity in view of the *ad valorem* system of levying taxes which prevailed in New York, but discriminates as to the charges upon vessels arriving from different ports. The act was considered inimical to the " commerce clauses of the Constitution " because of these peculiar features, notwithstanding the fees to be collected from " all vessels that load or unload or make fast to any wharf" in the city as compensation to the Captain of the port and Harbor Masters of New York.

In the case of the Packet Co. vs. St. Louis, 10 Otto, 423, Vicksburg vs. Tobin, ib., 430, and Packet Co. vs. Keokuk, 5 Otto, 80, the Supreme Court held that wharfage charges *for the use of the wharves* belonging to the city might be exacted from the vessels *using* the wharves, and the fact that the rate of such charges was ascertained by the tonnage measurement of each vessel did not vitiate the legislation imposing them, it being considered in those cases that *compensation* and not taxation were the ends contemplated, the charge resting upon contract and not upon the arbitrary power of taxation.

The pilot laws of the States are expressly sanctioned and authorized by Congress, and are as much laws of the United States as if they had been specially enacted by Congress. 7 How., 402; 12 How., 299; 6 Wall., 31.

The rules prescribed in respect to the charges for pilotage and half pilotage are regulations of contract, and contemplate that the necessities of navigation require the tender of pilotage to vessels approaching ports. Such laws exact of pilots great vigilance and hazard for the protection of commerce, which is compensated by certain charges of pilotage or half pilotage for services rendered or tendered. These rules originally prescribed by the States are older than the Constitution of the United States, and moreover

have been expressly adopted and authorized by Congress since the adoption of the Constitution.

If it be claimed that the act of the Legislature of Florida prescribing Harbor Masters' fees to be paid by vessels taking cargo in the port or making fast to a wharf is founded upon the same principles as the provision in respect to pilotage, such claim is erroneous upon the very face of the proposition. The two things are entirely unlike in their office, origin and necessity.

However convenient or valuable may be the office or services of a Harbor Master he is created by the statute of the State for police purposes. Every vessel is presumed to require the services of a pilot on approaching a port, and the laws of the States and of the Union require that the services of a pilot shall be tendered and paid for for the protection of lives and property. The services of a Harbor Master may or may not be required for the landing or loading of a ship. Clearly if a ship does not require these services, and does not demand them, the imposition of fees, to be paid to an officer of the State, is simply a method of compulsory taxation, no specific service being performed. The element of contract is entirely absent.

The tender of services by the Harbor Master is not required by the terms of the law, and hence his voluntary tender of services not required can give him no title to compensation.

The act of 1866 prescribes the duties of the Harbor Master, and by its terms he has " authority to regulate and station all vessels in the bay fronting the City of Pensacola, and at the wharves thereof, and remove, from time to time, such vessels as are not employed in receiving and discharging their cargoes to make room for such others as require to be more immediately accommodated," and to be the umpire in case of certain disputes; these, and his duty to

demand the permit of the physician or bill of health of every vessel arriving from sea, are the only services mentioned in the act.

Beyond the demand of the permit or bill of health he is merely " authorized " to act when called upon for that purpose. The fourth section empowers him to demand and receive from the commander, owner or consignee " of every vessel that may enter the port and load or unload, or make fast to any wharf," the fees described, excepting those vessels employed in trade between the ports of Alabama, Louisiana and Texas.

These fees are not designated as compensation for any service actually performed for any vessel, but are to be demanded " whether called on to render any service or not," as plainly as though those words were used in the law as they were used in the act of the Legislature of Louisiana, which was condemned in Steamship Company vs. Port Wardens, 6 Wall., 31. It was claimed in that case that this tax was for compensation to the Harbor Master and Wardens, whose duties were defined in the act; and so it is claimed here that the Harbor Master is required to provide conveniences and facilities for the benefit of every vessel that arrives and lands at Pensacola, and that thus every vessel should pay him " fees " whether called on to perform any special service or not. But the court in that case said that fees exacted in this manner were a tax, and that if its constitutionality could be maintained " upon the ground that it secures compensation for services, it is difficult to perceive upon what grounds the constitutionality of any State law imposing taxes for the benefit of the State government upon vessels landing in its ports can be questioned;" and " that the act of the Legislature of Louisiana in question is a regulation of commerce can hardly be doubted." And the court said, as we have seen, that no

act of Congress recognizes such laws as proper and beneficial regulations, while the State regulations in respect to pilotage are thus recognized.

Were these services actually required and rendered by the Harbor Master in each case, (such services as are mentioned in the act,) the only question would be whether the amount of compensation was reasonable or exorbitant, but that case is not presented.

The fees mentioned cannot be construed to refer to compensation for the use of wharves of the city, for it does not appear that the city owned any wharves, or had any proprietary control of wharves, nor that the Harbor Master had any such control. The fees constitute a tax, pure and simple, to be paid without regard to services performed; that such a tax is a regulation of commerce within the meaning of the Constitution is clearly held in the cases cited. A requirement of the payment of money for the support of an officer of the State for the privilege of landing or loading or discharging cargo is plainly a regulation or condition imposed upon commercial transactions by means of ships. The act declares to the carrier or consignee that the condition of landing at the port is not that he pay for the use of whaves of the city or of individuals, nor that he pay for any service or aid rendered to the vessel by the Harbor Master, but that he shall pay so much money if the ship receive or discharge cargo, or tie up to any wharf in the city, for the benefit of an officer who is authorized to perform certain duties if called upon to perform and not otherwise.

As a " regulation of commerce " the act in question is in violation of the provisions of the Constitution of the United States on that subject.

Much argument was had upon the question whether the act was in violation of that provision of the Constitution

forbidding the States, without the consent of Congress, to lay any duty of tonnage. It is unnecrssary in the view taken of the character of the act to discuss that question.

Without question, the act, discriminating as it does against the ports of several States by imposing the burthen of supporting the Port Warden, of Pensacola upon the commerce of foreign countries and of other States of the Union, excepting the favored States of Alabama, Louisiana and Texas, is partial and unequal, contrary to the spirit at least of the provision of the Constitution which secures to the citizens of each State all the privileges and immunities of citizens in the several States.

The decree of the Circuit Court is affirmed.