D. S. FORBES, APPELLANT, VS. THE BOARD OF HEALTH OF ESCAMBIA COUNTY, APPELLEE.

1. The act of 1885, Chapter 3603, providing for the creation of county boards of health and constituting them corporations, must be construed in connection with the acts of 1879, Chapter 3162, 1881, Chapter 3312, and 1883, Chapter 3443, Laws of Florida, as being in *pari materia* and having in view one object.

2. Under the act of 1879, Chapter 3162, as amended by the act of 1883, Chapter 3443, county boards of health have no authority to demand and collect from vessels coming into the jurisdiction of said boards fees for fumigation or disinfection, unless said vessels are subject to and have been put in quarantine.

3. Under the act of 1885, Chapter 3603, and the acts in *pari materia* prior thereto, county boards of health have no authority without an examination or inspection to require vessels upon entering ports within the jurisdiction of said boards to deviate from their course six miles and go to a quarantine station for inspection and examination.

4. County boards of health are corporate bodies invested by statute with functions of a public nature to be exercised for the public benefit, and in the absence of such remedy conferred by statute are not liable in an action of tort for damages in the performance of an official duty.

Appeal from the Circuit Court for Escambia County.

The facts of the case are stated in the opinion.

*R. L. Campbell* and *J. Emmet Wolfe* for Appellant.

*John C. Avery* for Appellee.

MABRY, J. :

In September, 1888, appellant, D. S. Forbes, commenced a suit against appellee in the Circuit Court of the First Judicial Circuit of Florida, for Escambia county. A demurrer was sustained on the 22nd day of October, 1888, to the original declaration filed by plantiff below, and leave given to amend the declaration. On the 5th day of November, 1888, plaintiff below filed the following amended declaration : "D. S. Forbes, by his attorney, R. L. Campbell, sues the Board of Health of Escambia County, a corporation existing under the laws of the State of Florida. For that on the 27th day of August, A. D. 1888, the British bark Tiber, whereof said plaintiff was and is master, did enter the port of Pensacola, in said county, and State—the port of Cape Town being the last port from which said bark Tiber sailed on the voyage which ended at the port of Pensacola on the day and year above mentioned—and plaintiff avers that although no quarantine had, before the entry of said bark into the said port of Pensacola, nor during the stay of said bark in said port, been declared by said defendant against said port of Cape Town, and although no contagious, infectious or pestilential disease existed upon said bark at the time of, or after her coming into the said port of Pensacola, as aforesaid, and although no such disease had occurred or existed upon said bark during her voyage from said port of Cape Town to said

28 SUPREME COURT.

D. S. Forbes v. The B. of H. of Escambia County.—Opinion of Court.

port of Pensacola, nor within thirty days before her arrival at said port of Pensacola, said defendant did compel said bark, immediately upon her entering the bay of Pensacola, in which said port of Pensacola is situated, to proceed directly to the quarantine station of said defendant, which said quarantine station is situated upon an arm of said bay of Pensacola, and distant southeasterly six miles from the said port of Pensacola, where vessels load and unload, thereby compelling said bark to deviate six miles from the course of vessels not subject to quarantine, proceeding to the usual place of loading and unloading cargo in said port of Pensacola; and did compel said bark to make said deviation and proceed to said quarantine station, as aforesaid, without any inspection or examination of said bark, her crew, or cargo, by any health inspector or city physician of said port, and without any report of such inspector or physician, or order of said defendant in respect to the sanitary condition of said bark, her crew or cargo, but solely and exclusively under the provisions of section 1 of a proclamation of said defendant made on the 23rd day of April, A. D. 1888, which is as follows : 'That from and after the 15th day of May, A. D. 1888, and until the 15th day of November, A. D. 1888, no vessel, which may have been between those dates at ports or places where yellow fever or other malignant disease had actually appeared, shall be permitted to discharge ballast or cargo, or load cargo in said bay of Pensacola ; and that all other vessels arriving in said bay between said

dates shall, immediately upon crossing the bar, proceed to the quarantine station hereinafter designated, to be inspected, and, if deemed necessary by the quarantine physician, discharge ballast and be submitted to a cleansing and disinfecting process.' And not under any other proclamation or order or requirement of said defendant, or law of the State of Florida; and did, for a long space of time, to-wit: twelve days, detain said bark, the reasonable damage for which detention is $73.94 per day, rating the same at the usual rate of demurrage per day for a vessel such as the said bark, which is 8 cents per day per registered ton, said bark being of the burden of 924 registered tons; and did also compel said bark to undergo fumigation, for which said defendant charged the plaintiff the sum of $46.20 for said fumigation and the materials used in effecting the same; and also did compel said bark, with her own crew and appliances, to discharge her ballast at said quarantine station, and did charge and compel the payment by said bark at the rate of thirty-five cents per ton for every ton of ballast so discharged, which amounted to 320 tons, making the aggregate charge for the discharging of said ballast of $112; and plaintiff further avers that he was compelled to pay said ballast and fumigation charges under pain of attachment and seizure of his vessel for the refusal of plaintiff to pay the same, and also of plaintiff being prevented from taking said bark from the said quarantine station to the loading ground for vessels in said port of Pensacola, for the purpose of fulfilling the charter

of said bark, for the fulfillment of which said bark came lawfully into the port of Pensacola, as aforesaid. Wherefore plaintiff says that he is damaged in the sum of $2,000, and therefore he brings this suit, etc."

Defendant below demurred to the amended declaration on the ground that "the same is bad in substance in this, that it fails to set forth any cause of action against defendant." This demurrer was sustained, and plaintiff below declining to further amend, a final judgment was rendered against him on the 12th day of December, 1888, from which decision an appeal is prosecuted to this court.

The errors assigned here are : 1. In sustaining the appellee's demurrer to appellant's amended declaration. 2. In rendering final judgment against appellant upon said demurrer.

The sole question for us to deal with now is the sufficiency of the allegations of appellant's declaration to state a cause of action against appellee. The Board of Health of Escambia County is a creature of statutory law, and all its duties and powers are derived from this source. Before analyzing the declaration to see if its allegations are sufficient to constitute a cause of action, let us refer to the statutory provisions on the subject of County Boards of Health. The first enactment on this subject to which reference need be made is the act of 1879, Chapter 3162, Laws of Florida. This act constitutes the Mayor, Aldermen and City Physi-

JUNE TERM 1891. 31

D. S. Forbes v. The B. of H. of Escambia County.—Opinion of Court.

cian, if there be one, of every incorporated city or town, a Board of Health for said city or town, and when there is no incorporated city or town, the Board of County Commissioners shall constitute a Board of Health for such county. The Boards of Health thus created are invested with power to declare quarantines on water or land, within their jurisdictions, against boats or vessels upon which any contagious, infectious or pestilent disease existed or had existed during the voyage to said city, town or district, or within thirty days next preceding the arrival of said boat or vessel within the jurisdiction of said boards, and against any country or locality infected with plague or other malignant or contagious disease. Said boards are authorized to make such rules for the regulation of quarantines as may be deemed necessary, not inconsistent with said act, and to prescribe penalties for their violation. They are also authorized to appoint one or more Port Inspectors whose duty it shall be to board every boat or vessel approaching such city or town and ascertain if the same is subject to perform quarantine, and if such boat or vessel is subject to quarantine, the inspector visiting her shall order her thrown into quarantine at the place designated for such purpose and immediately notify the board that such boat or vessel has been ordered into quarantine. This act gave to the Boards of Health power to deal with infected persons, goods, vessels or localities, and as to such mat-

32 SUPREME COURT.

D. S. Forbes v. The B. of H of Escambia County.—Opinion of Court.

ters they could only act by putting in operation a quarantine. The boards created by this act have no power to act in regard to matters pertaining to public health, otherwise than by establishing quarantines. To carry out this object such boards are authorized to establish quarantine grounds, appoint Port Inspectors and quarantine physicians, and to make rules regulating quarantines when declared. After a' quarantine has been established by the Board of Health as provided by this act, and due notice thereof given, all persons are bound to observe the regulations thereof. This act, section 17, provides for the payment of the expenses of the quarantine boards and the officers and employes in and about quarantine, and also for the payment of certain fees by vessels undergoing inspection and in quarantine. This section has been amended by the act of 1883, Chapter 3443 Laws of Florida. In 1881 the Legislature, by Chapter 3312, Laws of Florida, provided, that the Governor shall appoint for every incorporated city and town in this State containing three hundred or more registered voters a Board of Health. Section 4 of this act confers upon Boards of Health created by its power to act in regard to all matters pertaining to the public health and vital statistics, and to make such rules and regulations as they may deem necessary for its government and the protection of the public health. The fifth section gives to said boards in matters of quarantine the same powers as are conferred upon

Boards of Health by the act of 1879, Chapter 3162, Laws of Florida. This act also provides that section 1 of Chapter 3162, so far as it relates to cities and towns of less than three hundred registered voters, is not repealed. The act of 1885, Chapter 3603, provides that the Governor shall appoint for every county in the State a Board of Health, which shall be a corporation, with power to sue and be sued, contract and be contracted with, and to acquire and dispose of property, both real and personal. The sixth section of this act provides that the County Commissioners of each county are empowered to assess and levy a tax not to exceed in any year two mills on the dollar to. defray the expenses of said Boards of Health. The County Boards of Health created under this act shall have full power to act in all matters pertaining to quarantine, public health, vital statistics and the abatement of nuisances, to appoint and suitably compensate a Port Inspector and such other officers or agents as they may find necessary, and any person who shall interfere with, hinder or oppose any such officer or agent of the board in his or their discharge of duty shall be fined not exceeding $1,000. The ninth section of this act provides that such Boards of Health may at any time establish such quarantines as in their judgment are expedient for the public welfare, and to provide rules and regulations for the same ; and after the same are established against any port or place, any person

violating the same shall be guilty of a felony, and upon conviction shall be punished by fine or imprisonment.   The tenth section enacts that every such board may adopt such rules and regulations as they may deem needful in. the exercise of the powers and discharge of the duties created and imposed by this act.

In Ex parte O'Donovan, 24 Fla., 281, it. was held that "the statute of 1885 (Chapter 3603) providing for the appointment of County Boards of Health, and defining their powers, does not repeal the act of 1879 (Chapter 3162) providing a uniform system of quarantine in this State.   These statutes are in *pari materia*, and to be construed together."   It was also held in the case of Ferrari v. The Board of Health of Escambia County, 24 Fla., 390, that these acts are on the same subject and have in view one object and should be construed together as one system.

The question arising under these acts, under what conditions can the County Board of Health of Escambia County detain vessels coming into the port of Pensacola and impose upon them payment of fees for inspection, fumigation and discharge of ballast?   All the powers which this board can exercise in this respect must be derived from the statute.   This board is a corporate body, the creature of statute, and is incapable of exercising any other powers than those conferred by the act of incorporation, or in any other manner than it authorizes.   The act of 1885, however,

authorizes County Boards of Health to declare quarantines, and to act in all matters pertaining to quarantines, and this must be taken to confer on such boards all the powers given by statute in reference to such matters. In Ex parte O'Donovan, *supra*, it was held that the authority to declare quarantine conferred by the act of 1885, means quarantines as authorized by the act of 1879. The latter act, section 3, provides in reference to vessels, that "any Board of Health may at any time during each year establish a quarantine, forbidding the approach to the city, town or district over which said Board of Health has jurisdiction, of any vessel or boat upon which any contagious, infectious or pestilent disease has occurred or existed during the voyage to said city, town or district, or within thirty days next preceding the arrival of said vessel or boat at said city, town or district, and forbidding the landing of any persons or goods from such boat or vessel until such boat or vessel has performed quarantine in accordance with the provisions of this act, and with the rules and regulations of the Board of Health." Section 4 provides that "any Board of Health may at any time upon information that any country or locality is infected with plague or other malignant, contagious or infectious disease, establish quarantine against such country or locality, forbidding the approach to the town, city or district over which the said board may have jurisdiction of any vessel or boat or persons from

such infected country or locality, and forbidding the landing of such boats or vessels, or of any persons or goods therefrom until such boat or vessel, person and goods shall have performed quarantine in accordance with the provisions of this act and with the rules and regulations of the Board of Health." The sixth section provides that the Boards of Health "may apdtnio one or more Port Inspectors whose duty it shall be to board every boat or vessel approaching such city or town, and to ascertain if the said boat or vessel is subject to perform quarantine under the third or fourth sections of this act; and if such boat or vessel is subject to perform quarantine as aforesaid, the inspector so boarding said boat or vessel shall order the same, together with all persons and goods, thrown into quarantine at the place designated by the Board of Health. The said inspector shall immediately notify the Board of Health that the said boat or vessel has been ordered into quarantine." The quarantines mentioned in this act are not self-existing. They are to be established by the Boards of Health when conditions give rise to them. The object of the statute in providing for quarantines was to protect the people of the State from infectious, contagious or malignant disease, and the Boards of Health, in order to accomplish this object, were authorized to establish and maintain quarantines against infected vessels, or vessels from infected places and infected localities. Before any vessel can be put in quarantine one must be established and the vessel

ascertained, by inspection, to be subject to perform quarantine.    If the vessel is ascertained by inspection not to be subject to quarantine, she cannot be detained by the Board of Health under the act of 1879 for any purpose.    If a vessel is not subject to quarantine—that is, if she has not been found subject to perform quarantine on account of having on board, or existing within thirty days next preceding the arrival of said vessel at some town or city, " contagious, infectious or pestilent disease," or on account of her coming from some infected country or locality, there is no authority to impose upon her any other charge than that for inspection.    It is clear that all the authority the Board of Health has to collect fees from such vessels must be found in the statute.    The seventeenth section of the act of 1879, as amended by the act of 1883, (Chapter 3443) provides that " all the officers and employes in and about quarantine, shall be paid, and the expenses of quarantine board, by the city or town establishing such quarantine.    Every vessel undergoing inspection by the Port Inspector, and every vessel in quarantine which, in the opinion of the Port Physician, shall require and receive fumigation, or other disinfection, shall pay therefor to the Board of Health such fee or fees as may be prescribed by said Board of Health, and if the master of any ship, boat or vessel shall refuse to pay such fees the Board of Health may detain said vessel in quarantine until the same are paid, or may sue for and recover the same from the owner of such ship or vessel."    The Port Inspector, as provided

in the sixth section of the act of 1879, is required to board the vessel as she approaches the city or town, and if found subject to perform quarantine she is thrown into quarantine. The statute provides that every vessel undergoing inspection shall pay such fees therefor as may be prescribed by the Board of Health, and this of course becomes a charge, whether said vessel is ordered into quarantine or not. As will be seen, it further provides that every vessel in quarantine which, in the opinion of the Port Inspector, shall require and receive fumigation or other disinfection, shall pay the fees therefor which the board shall prescribe. If the vessel is not subject to and has not been put in quarantine, there is no authority under this act to make her pay for fumigation or disinfection fees. Counsel for appellee contends, however, that the defendant has power not only to establish quarantines, but to act in all matters pertaining to the public health, vital statistics and the abatement of nuisances, and to make rules and regulations to govern such matters. That under the power given to make rules to protect the public health defendant had the right to require vessels entering the port of Pensacola to go to a point called a quarantine station for inspection, and if in ballast, and deemed expedient, to discharge ballast and undergo fumigation. It is true that County Boards of Health, in addition to the power to declare quarantines, have authority to act in all matters pertaining to public health, vital statistics and the abatement of nuisances, and there is an express grant of power to such boards to

adopt such rules and regulations as they may deem needful in the exercise of the powers conferred to protect the public health. But the power to act in matters pertaining to public health and to make rules and regulations in reference thereto does not include the authority to demand and collect fees, or other money exactions from those who are made to undergo quarantine. Such a power as this must be expressly conferred in order to its rightful exercise. The Board of Health of Escambia County had a right to make such rules in reference to the deposit of ballast near the city of Pensacola as was deemed necessary to preserve the health of the inhabitants of that city. It would be competent when deemed essential to preserve the public health, for such board to direct that all vessels coming into the port of Pensacola and in ballast shall discharge the same a reasonable distance from the wharves or inhabitants of the city, and to enforce such rules by adequate penalties. When, however, fees, charges or money exactions are attempted to be imposed on vessels coming into port, the authority to demand and collect the same must be pointed out in the statute. We are satisfied from a careful examination of the statutory provisions on the subject in force at the time the cause of action is alleged to have accrued in this case that no fees, other than for inspection, can be imposed on vessels coming into the jurisdiction of County Boards of Health, unless such vessels have been ascertained, by inspection, to be subject to quarantine and have been put in quarantine.

Let us now turn our attention to the allegations of the declaration and see if sufficient has been averred to make a case against defendant. It is alleged that defendant promulgated on the 23rd day of May, 1888, the following order, viz: "That from and after the 15th day of May, A. D. 1888, and until the 15th day of November, 1888, no vessel, which may have been between those dates at ports or places where yellow fever or other malignant disease has actually appeared, shall be permitted to discharge ballast or cargo, or load cargo in said bay of Pensacola; and that all other vessels arriving in said bay between said dates shall immediately upon crossing the bar proceed to the quarantine station hereinafter designated, to be inspected, and if deemed necessary by the quarantine physician, discharge ballast and be submitted to a cleansing and disinfecting process." That on the 27th day of August, 1888, the bark Tiber entered the port of Pensacola, in Escambia county, Florida, the port of Cape Town being the last port from which said bark sailed on her voyage to the port of Pensacola, and that no quarantine had been established against Cape Town by defendant before said bark entered the port of Pensacola, or during her stay in said port, and that no contagious, infectious or pestilential diseases existed upon said bark during her said voyage from Cape Town, nor within thirty days before her arrival at the port of Pensacola, nor at the time of, or after her coming into said port. Further, that upon entering said bay of Pensacola said bark, without any inspection or

examination of said vessel, her crew or cargo, by any health inspector or physician of said port, was compelled to proceed directly to the quarantine station of defendant, and thereby to deviate six miles from the course of vessels not subject to quarantine. That defendant proceeded against said bark solely and exclusively under the said proclamation dated 23rd day of May, 1888, and did retain said bark twelve days, to her damage $73.94 per day; and did also compel said bark to undergo fumigation at a cost of $46.20, and with her own crew and appliances to discharge her ballast at said quarantine station, and pay the sum of $112 therefor, rating the same at thirty-five cents per ton for ballast discharged; and that plaintiff was compelled to pay said ballast and fumigation charges under pain of seizure of his vessel, and also of being prevented from taking said bark from said station to the loading ground in the port of Pensacola. All the allegations of the declaration that are well pleaded are admitted by the demurrer.

Admitting the allegations of this declaration to be true, the defendant had no authority to impose any fees on the Tiber for fumigation or unloading ballast. She was not subject to quarantine, as provided by statute, and the authority given defendant to act in matters of public health, and to make rules and regulations in reference thereto, did not extend the right to collect such fees. When a quarantine has been established, and a vessel entering port is ascertained, by inspection, to be subject to perform quarantine, she

42 SUPREME COURT.

D. S. Forbes v. The B. of H. of Escambia County.—Opinion of Court.

may, in the opinion of the Port Physician, be required
to undergo fumigation or disinfection, and in this
event shall pay therefor such fees as may be prescribed
by the Board of Health. The statute authorizes fees
for inspection, and when a vessel is subject to quar-
antine, and in quarantine, she may be taxed by the
Board of Health with the fees for fumigation or disin-
fection, and beyond these charges the County Boards
of Health have no power to go in exacting money from
vessels. In the case of Ferrari v. Board of Health of
Escambia County, *supra*, a regulation of said board
providing that "vessels in quarantine may be dis-
charged at the crib therein by paying fifty cents per
ton for so discharging," was sustained by a majority
of the court. Judge Maxwell, in speaking for the ma-
jority of the court, said, in reference to this regula-
tion, "that is legitimate, if such discharge is for the
purpose of disinfecting the vessel, but not otherwise."
He was speaking of a vessel subject to quarantine, and
in quarantine. The statute authorizes fees only for
inspection, fumigation or disinfection, and if in disin-
fecting a vessel in quarantine the Board of Health
would have to discharge her ballast in order to accom-
plish this object, the cost of the same might be included
in the disinfecting fees. But we see no authority in
the statute authorizing County Boards of Health
to establish a place where vessels with their own crew
and appliances shall discharge ballast and impose
charges on such vessels for so doing. The regulation
under which appellant avers his vessel was detained

and forced to pay fees requires vessels crossing the bar of Pensacola to proceed to the quarantine station to be inspected, and if deemed necessary by the quarantine physician, to discharge ballast and be submitted to a cleansing and disinfecting process. No fees or charges are mentioned in this regulation to be paid, nor is the location of the quarantine grounds where vessels shall go on entering the bar for inspection fixed. The declaration avers that defendant did compel the Tiber without an inspection to go six miles deviation out of her course to a quarantine station, and did compel her to pay for fumigation, and to pay for discharging her ballast with her own crew and appliances at said station. In Ex parte O'Donovan, *supra*, a regulation of the Board of Health, that a vessel shall be detained until not only the inspection has been made, but also until the report and release of the vessel, was held unauthorized by the statute. The statute provides (act of 1879, Chapter 3102, sec. 6,) that the Port Inspector shall "board every boat or vessel approaching such city or town, and to ascertain if the said boat or vessel is subject to perform quarantine * * ; and if such boat or vessel is subject to perform quarantine as aforesaid, the inspector so boarding said boat or vessel shall order the same, together with all persons and goods, thrown into quarantine at the place designated by the board." The declaration avers that plaintiff's vessel, without an inspection or examination, immediately upon entering the port of Pensacola, was forced by defendant to go six miles out of her course

to the quarantine station. Conceding this to be true, it was unauthorized by the statute or any rules or regulation which defendant had authority to make. Our conclusion is, that the detention of the Tiber, and the exaction from her of fees for fumigation and the discharge of her ballast by defendant in the manner and under the conditions alleged in the declaration, were without legal authority. This conclusion is based upon the statutory provisions in force on the subject at the time of the alleged cause of action.

Counsel for appellee further contends that should the court find that the declaration presents a case in which the acts complained of were not authorized by the terms of the law, yet the board only committed an error of judgment for which it cannot be held responsible in damages in an action in tort. It will be discovered upon an examination of the declaration that appellant's suit is not to recover back money illegally exacted, but the action is in tort for illegally detaining the vessel and compelling her pay certain charges. Can the defendant, as a County Board of Health, be sued for damages in respect to the matters alleged in the declaration? The answer to this question, we admit, is not free from difficulty. The defendant is a body corporate, made so by statute, capable of suing and being sued, contracted and being contracted with, and of acquiring and disposing of property real and personal. A careful examination of the various statutory provisions in reference to the creation, duties and powers of these corporate boards leaves no room to

doubt that the functions conferred upon them are a
part of the police power of the State, to be exercised
exclusively for public purposes. The sole purpose of
the Legislature in creating these corporate boards was
to protect the inhabitants of the State from contagious
or infectious disease and to preserve the public health.
Such powers and duties are of a public nature and of
the highest importance and value. Cooley on Torts,
382; Bryant v. City of St. Paul, 33 Minn., 289; Spring
v. Inhabitants of Hyde Park, 137 Mass., 554; Harrison
v. Mayor of Baltimore, 1 Gill, 264; 60 Conn., 80, Ray-
mond v. Fish.

In determining the liability of public corporations, a
distinction has been drawn between the functions exer-
cised by them as agencies of the State as a part of its
governmental machinery for the public benefit, and
those denominated strictly corporate powers conferred
for the benefit and profit of the corporation. In the
sphere of the former powers they are exempt from liabil-
ity upon the theory that the corporation, to that extent,
is performing a part of the functions of the State govern-
ment and the officers are public officers, but in the latter
sphere they are held liable as private corporations for
the acts of their agents. This distinction is recognized
generally by the authorities, although its application
in many of the adjusted cases has not been free from
confusion. Its application has been made most fre-
quently in suits against municipal corporations. In
the case of Hill v. City of Boston, 122 Mass., 344,
which was a suit for damages for injuries received by

a child at school by reason of a defective house, required by law to be furnished by the city, Judge Gray reviews the authorities on this subject. The conclusion reached in this well-considered case is, "that a duty which is imposed upon an incorporated city, not by the terms of its charter, nor for the benefit of the corporation, pecuniary or otherwise, but upon the city as the representative and agent of the public, and for the public benefit, and by general law applicable to all cities and towns in the commonwealth, is a duty owing to the public alone, and a breach thereof by a city is to be redressed by prosecution in behalf of the public, and will not support an action by an individual, even if he sustains special damage thereby." See also Halford v. City of New Bedford, 16 Gray, 297; Wallcott v. Inhabitants of Swampscott, 1 Allen, 101; Buttrick v. City of Lowell, Ibid, 172; City of Richmond v. Long's administrators, 17 Gratt., 375; Hill v. Board of Aldermen of Charlotte, 72 N. C., 55; Board of Commissioners of Bartholomew County v. Wright, 22 Ind., 187; Hayes v. City of Oshkosh, 33 Wis., 314; Dargan v. Mayor, etc., of Mobile, 31 Ala., 469; Mattaugh v. City of St. Louis, 44 Mo., 479; Condict v. Jersey City, 46 N. J., (Law), 157; Maxmillian v. Mayor, etc., of the City of New York, 62 N. Y., 160; Dillon on Municipal Corporations, sec. ———. A public corporation invested with powers for public purposes may also have conferred upon it powers for private advantage and emolument. This has been held in many cases against municipal corporations. In Bailey v. Mayor of New

York, 3 Hill, 531, it is said in reference to these two powers blending in a public corporation : " but the distinction is quite clear and well-settled, and the process of separation practicable. To this end, regard should be had, not so much to the nature and character of the various powers conferred, as to the object and purpose of the Legislature in conferring them. If granted for public purposes exclusively, they belong to the corporate body in its public, political character. But if the grant was for purposes of private advantage and emolument, though the public may derive a common benefit therefrom, the corporation, *quoad hoc*, is to be regarded as a private company." The case of Jones v. City of New Haven, 34 Conn., 1, illustrates this distinction. The fact that these boards are created corporations with power to sue and be sued does not of itself authorize a suit against them for everything, but this must be taken to mean that such artificial bodies may be sued like an individual for all those matters and things for which they are legally liable. To determine the liability we must look to the principles of law applicable to such matters. Freeholders of Sussex County v. Strader, 18 N. J. (Law), 108; Finch v. Board of Education, 30 Ohio St., 37.

In the case of Ogg v. City of Lansing, 35 Iowa, 495, suit for damages, was instituted against the city for the negligence of its officers or agents in executing sanitary regulations adopted to prevent the spread of small-pox. A statute of Iowa provided that the city council shall have power to establish a Board of Health

48 SUPREME COURT.

D. S. Forbes v. The B. of H. of Escambia County.—Opinion of Court.

and to invest it with powers and duties necessary to secure the people of the city against contagious and malignant diseases. It was alleged in this case that the agents and employes of defendant requested and directed plaintiff to assist in taking a coffin in which the corpse of a person who had died of small-pox was deposited, without giving him information of this fact, and without having cleansed the house in which the coffin was, and that plaintiff went to his home and soon thereafter had small-pox, and from him two of his children contracted the disease and died. On demurrer it was held that defendant was not liable. In White v. Town of Marshfield, 48 Vt., 20, suit was brought against the town for neglect and refusal of the selectmen to take care of and provide for plaintiff as the statute required, while he was infected with small-pox, by reason whereof the disease was communicated to the family of plaintiff and three of his children died. The statute provided that the selectmen of the town should perform certain duties to protect the inhabitants against infectious disease. On demurrer it was held that the action would not lie. In the City of Richmond v. Long's Administrators, 17 Gratt., 375, suit was instituted against the city of Richmond for the value of a slave who, it was alleged, lost his life through the carelessness of the agents of the city. The declaration alleged that the slave was admitted into the hospital of the city to be cared for and treated for small-pox, in pursuance of the ordinance of the city, and that the city carelessly and negligently permitted him to escape

from the hospital and go off at night, whereby he lost his life. The ordinance of the city establishing the city hospital was adopted in pursuance of legislative authority for towns and counties in the State to provide against contagious disease. The liability of the city was denied in this case, and the Judge who wrote the opinion said that if a recovery could be sustained he did not perceive why, by parity of reason, the State should not be held liable, through its public functionaries, in civil actions at the suits of individuals, for loses or torts occurring in the management of its departments under its immediate control and supervision. In Maine a statute provided that the selectment of any seaport town when deemed necessary to protect the safety of the inhabitants thereof, may cause any vessel arriving there from any port or place, to perform quarantine at such place and under such regulations as they may judge expedient. That said towns may select a health committee or health officers who may perform the duties and exercise the authority which selectmen may perform. Under the statute the health authorities had no power to impress vessels coming into port, but could compel them to perform quarantine. One Mitchell sued the city of Rockland for damages sustained by him for the partial destruction of his vessel and her cargo by fire occasioned by the health officers of said city. This case was three times before the Supreme Court of that State, reported in 41 Maine, 363, 45 Maine, 496; and 52 Maine, 118. In this case plaintiff's vessel came into port with a case of

4

50          SUPREME COURT.

D. S. Forbes v. The B. of H of Escambia County.—Opinion of Court.

small-pox on board, and the health officers of the city
took possession of the vessel and it was claimed,
through their illegal and negligent acts the vessel
caught on fire. It was decided finally in this case that
neither a town or its officers had any right to appro-
priate or interfere with private property except so far
as that right is conferred by statute, and that health
officers of the city of Rockland had no authority to
take possession of plaintiff's vessel; also that neither
the relation of master and servant, nor principal and
agent existed between a town and its health or police
officers, nor is the town liable for their unlawful or
negligent acts. Mitchell v. City of Rockland, 52
Maine, 118. The same doctrine was re-affirmed in this
State in the case of Lynde v. City of Rockland, 66
Maine, 309. Here the plaintiff alleged that his hotel
in the city was taken possession of by the health offi-
cers of the city against his consent, and converted into
a small-pox hospital for thirty days, thereby endanger-
ing the lives and health of the plantiff and his family,
and destroyed the business, reputation and character
of the hotel for all time to come. It was decided in
this case that no action can be maintained against a
city or town for the unlawful acts of its health commit-
tee or other officers in taking possession of a house and
using it for a small-pox hospital without the consent
of the owner and without legal authority. The action
in this case was in tort. See also the case of Barbour
v. City of Ellsworth, 67 Maine, 294, sustaining the
same doctrine. A case similar in its features is Spring

v. Inhabitants of Hyde Park, 137 Mass., 553. In this case the action was in assumpsit on contract, and it was held that under the statute of Massachusetts which provided how property could be impressed for use as a hospital, a Board of Health of a town without pursuing the course pointed out by the statute, has no authority to take possession of a dwelling house without the consent of the owner, and use the same as a hospital for a person found therein sick with contagious disease, and the owner cannot maintain an action of contract against the city for the use and occupation of the house during the time it was so held by the Board of Health. In the case of Aaron v. Broiles et al., 64 Texas, 316, it was held that the city council had the right under legislative authority to enact an ordinance providing for the removal from the city of persons afflicted with contagious disease, and that there was nothing judicial in the act of removing persons under such an ordinance, but in doing so, those to whom such a duty is given by the city must make every reasonable provision for the safety of the persons removed. The suit in this case, however, was not against the city or the Board of Health of the city, but the individuals who compose the Board of Health, the mayor and marshal of the city. The plaintiff's case against the defendants was that they, acting under the ordinance of the city, took by force his child four years old, sick at the time with small pox, and its mother, and conveyed them to the country in the rain and cold at night, and failed to provide them any suitable place

52          SUPREME COURT.

D. S. Forbes v. The B. of H. of Escambia County.—Opinion of Court.

to stay, which caused the death of both of them : held
that the plaintiff was entitled to recover damages.

In the case of Southampton & Itchin Bridge Co. v.
Local Board of Health of Southampton, 8 E. & B: (92
Eng. Com. Law), 801, an action for damages was sus
tained against the defendant as a corporate body un-
der allegations that "defendant acting as such Board
of Health, conducted itself so wrongfully, improperly
and negligently, and with want of due care in the con-
struction, management and direction of a certain sewer
that by means of the wrongful, improper and negligent
conduct of defendant as such Board of Health, great
quantities of filth and sewage matter were poured in
and upon certain canals of which plaintiffs were pro-
prietors. The act incorporating the defendant as a
local Board of Health authorizes it to construct sewers.
It was contended in this case that defendant could not
as a Board of Health be held liable in an action for
damages. Lord Campbell said that defendant's liabil-
ity must be determined by a true interpretation of the
statute by which it was created. The decision against
the defendant was placed upon the construction of the
statute. The act creating the Board of Health pro-
vided that no action shall be maintained against the
board unless previous notice thereof be given for one
month, and that the defendant may tender amends and
plead such tender to the action. This language was
held to give a right of action for damages against de-
fendant.

Independent of the provision making County Boards

of Health bodies corporate, with power to sue and be sued, there is nothing in the statutory provisions in reference to them giving the right of action in tort for damages, or indicating a purpose on the part of the Legislature to subject them to such suits. As we have already seen, the right alone to sue and be sued cannot be construed to give such remedy. These boards are created for public purposes in the exercise of the police power of the State, and they have no corporate interest in the exection of the powers given them. They cannot levy taxes, and under the statute must invoke the taxing power of the county authorities for the means to defray their expenses. It is true they can fix and collect fees for inspection, and when vessels are subject to quarantine and in quarantine can collect fees for fumigation when deemed necessary, but it is evident that such exactions were intended to meet the reasonable expenses in such matters. In the case of Finch v. Board of Education, 30 Ohio St., 37, the liability of defendant in tort as a corporate body arose. The Board of Education of Toledo was a corporation with power to sue and be sued, and derived its means of support from taxation by the city of Toledo, and a portion of the public school fund. The suit was for damages for negligently digging wells or openings near school buildings, into one of which a child at school fell in and was hurt. Judge Ashburn said in delivering the opinion : ''We have wholly failed to find any provision of the school law, general or special, creating or implying the liability of defendant in this class of

cases. No possible means appears in the school laws, by which defendant, if liable for a tort, could provide a fund out of which to satisfy a judgment against it." It was held in this case that while defendant was a corporation with power to sue and be sued, yet it was a corporation for public purposes, and the nature, duties and powers conferred upon it was a sufficient reason why it was not liable to be sued in tort. See also McDonald v. Massachusett's General Hospital, 120 Mass., 432 ; Benton v. Trustees of Boston City Hospital, 140 Mass., 13 ; Summers v. Board of Commissioners of Daviess county, 103 Ind., 262 ; Sherbourne v. Yuba county, 21 Cal., 113 ; Shearman & Redfield on Negligence, sec. 266. There are cases of recovery in actions of tort against municipal corporations, but they procceed upon the ground that where the corporation acts in the exercise of powers or performance of duties not discretionary, governmental or public in their nature, but ministerial and for some corporate benefit, it incurs the common law liability for its acts as an individual. Bailey v. Mayor of New York, *supra*, Gibbs v. Trustees of the Liverpool docks, 3 H. & N., 164; Jones v. City of New Haven, *supra*. In the case before us the plaintiff avers that solely and exclusively under the proclamation of the Board of Health, and which is set out in the declaration, plaintiff's vessel was compelled to go to quarantine station and discharge ballast and pay fees. It is not charged that defendant acted maliciously or wilfully, or otherwise, for ought that appears in the declaration, than

in the discharge of a supposed public duty. An examination of the authorities and the principles governing such cases leads us to the conclusion that defendant was invested with public functions and the duties it owed were to the public, and as such it comes within the sphere of public functionaries, exempt from liability in tort, unless such remedy should be given by statute. As we have seen, no such remedy has been provided by statute, and the declaration shows that plaintiff is pursuing this course.

The judgment of the court below sustaining the demurrer is affirmed.