D. O. VINCENT, as Harbor Master of the Port of Jacksonville, v. FOSS & CRABTREE, INC.

160 So. 49.
Division B.
Opinion Filed July 23, 1934.
On Rehearing March 13, 1935.

718

*Milam, McIlvaine & Milam,* for Appellant;
*Elliott Adams,* for Appellee.

BROWN, J.—Appellee presented its bill in the Circuit Court of Duval County seeking an injunction against the appellant, the Harbor Master of the Port of Jacksonville, to prevent the collection of fees from complainant under Sections 3902-3916, Comp. Gen. Laws of 1927. The defendant filed his answer, and the cause coming on to be heard before Circuit Judge Elwyn Thomas upon bill and answer, the prayer of the bill for injunction was granted and the defendant as Harbor Master was perpetually· enjoined from assessing against the plaintiff, or its vessels, any charges or assessments by virtue of the said statutes except such charges as may be due defendant for services actually rendered to the said vessels to the plaintiff upon the request and employment of the defendant as such Harbor Master. From this decree, the defendant took this appeal, assigning the rendition thereof as error.

In a well prepared opinion rendered in connection with the decree, the chancellor held that the complainant was entitled to the relief prayed for under the case of Webb v. Dunn, 18 Fla. 721, which appears to be the only expression of this Court on the matter presented.

The bill alleged that the plaintiff is a corporation engaged in the business of operating vessels in foreign and inter-

state commerce; that it operated two schooners, which frequently called at the Port of Jacksonville, both from foreign ports and in coastwise trading; that the defendant as Harbor Master and *ex officio* member of the Board of Port Wardens and Pilot Commissioners of the Port of Jacksonville, Florida, purporting to act under the statutes above referred to is attempting to assess, demand and collect from the defendants $10.00 for each and every call of said vessels at the Port of Jacksonville, and is threatening to sue the plaintiff and to libel the said vessels, notwithstanding the fact that the plaintiff does not require, nor had it required, the services of the defendant as Harbor Master in connection with the said vessels. That said defendant claims authority to make such assessments and collections for stationing and assigning berths at wharves for the vessels of the plaintiff, which the plaintiff alleged was entirely unnecessary for the reason that plaintiff maintains its own wharves for the docking of said vessels. That said defendant further claims that said sums of money so assessed are due and payable to him for the inspection of said vessels and the policing of said harbor and said vessels against nuisances or the polluting of the water of said port and the facilitating of the orderly discharge of cargoes and the policing of said vessels against violation of safety measures and the hazards of fire or breaching of health measures or safety measures; and yet the plaintiff alleges that the attempt to make such assessments and collections constitute a duty of tonnage and an impost duty on imports and exports in violation of Art. I, Section 10, of the United States Constitution, and that the same lays a burden upon interstate and foreign commerce and deprives the plaintiff of its rights, privileges and immunities under the Constitution and laws of the United States.

The defendant in his answer alleged that the State of Florida in adopting the measures here involved, was acting in the reasonable exercise of its general police powers, and also under the power reserved to it under Art. I, Section 10, Clause 2, of the Constitution of the United States in the exercise of its powers to adopt and enforce reasonably necessary inspection laws in the interest of the Port of Jacksonville, the ships and vessels using such port and the public generally of said State, in the following particulars:

"(a) Enforced observance of the quarantine laws and imposition of safeguards against noxious and contagious or infectious diseases with suitable information and reports to the health authorities when necessary;

"(b) Enforcement of health measures by use of approved rat-guards or mooring lines and cargo inspection of ships from infested areas when such precautionary measures are necessary for the protection and health and welfare of the port, those using the port and the public of the State of Florida;

"(c) Enforcement of all reasonable health measures imposed by the State or the port authorities in the interest of the port, those using the port, and the public at large, relating to disposal of garbage or sewerage by vessels using the harbor;

"(d) Enforcement of special assignment to berths, anchorage, docks or wharves, of vessels carrying or discharging dangerous or offensive cargoes;

"(e) Enforcement of measures designed to protect the harbor, shipping therein, and the port against undue or unusual fire hazards created by ships or vessels carrying dangerous or hazardous cargoes without smoke screens and mooring or anchoring in the proximity of inflammable

merchandise such as rosin, turpentine and other like commodities stored along the waterfront;

"(f) Enforcement of protective measures designed to protect against offensive or dangerous discharge of petroleum or petroleum products on the waters within said port, creating undue fire hazards or hazards to the health of the community.

"All of which services are performed in the interest of the State, the port, those using the harbor and the general public by the defendant Harbor Master under the inspection or police powers of the State specifically reserved to the State under the mentioned section of the Constitution of the United States, which services cannot be performed by any other constituted authority other than the Harbor Master, defendant herein.

"And the defendant specifically denying plaintiff's allegation that no services are performed by the defendant Harbor Master for the benefit or protection of the plaintiff, shows unto the Court that the services mentioned as required of the defendant Harbor Master by State statute and by the regulation of the port authorities inure to the direct and special benefit of the plaintiff in the following specific particulars:

"(a) The defendant Harbor Master is by the statutes complained of charged with the specific duty of keeping open lanes of travel in said harbor for plaintiff's use in moving its vessels and shipping into and out of said port and especially in the movement of such ships or vessels to or from the private docks and wharves of the plaintiff;

"(b) In preventing ships and vessels other than those of the plaintiff from the use of unauthorized anchorage which might obstruct the plaintiff's vessels and shipping in moving to and from its private docks or cause such movement to

be cumbersome or dangerous and causing the removal of any such obstruction occasioned by unauthorized anchorage of other vessels;

"(c) Protection of the harbor -and the plaintiff's ships and the plaintiff's docks and wharves from undue and unusual fire hazards occasioned by the proximity of ships carrying dangerous or hazardous cargoes and from the discharge or leakage of oil or petroleum products on the waters of the harbor.

"(d) Protecting the plaintiff's docks and wharves, the plaintiff's ships moored thereto, and the plaintiff's ships entering and leaving the harbor from all violations of safety regulations as to speed and controlling of vessels using the harbor.

"(e) Protection of plaintiff's ships and crews and those working in connection therewith in all matters of health controlled by harbor regulations.

"All of which services defendant Harbor Master performs for the specific benefit and advantage of the plaintiff by maintaining an office in said port with telephone communication so that he can be reached at any time of the day or night and continuously maintaining harbor patrol with suitable marine equipment engaged constantly and continuously in enforcing harbor regulations for the benefit of the plaintiff and all those using said harbor.

"7. Further answering paragraph 6 of the plaintiff's bill of complaint, the defendant Harbor Master shows that the statute complained of authorizes the assessment of inspection fees up to the maximum sum of Twenty Dollars ($20.00) for each vessel calling at the Port of Jacksonville where services are rendered such vessel. That said statutory fee of $20.00 is charged by the defendant against only those vessels requiring special services of the Harbor

Master in addition to the general services enumerated; that the fee complained of in the sum of Ten Dollars ($10.00) is the minimum fee assessed and charged by the defendant harbor master against any vessel entering and using the Port of Jacksonville where no special or particular services is required; that under the State statute complained of the cost of the State's inspection service rendered necessary in the interest of the port, the citizens thereof and the vessels using the harbor may be met from inspection fees only and that the defendant Harbor Master is unable to maintain offices so that his services may be constantly available and maintain marine equipment and harbor patrol with proper inspection of all shipping using the harbor for lesser fees; that said fee of $10.00 per vessel is assessed without discrimination against all types of vessels using the harbor whether engaged in intra-state, inter-state or foreign commerce; that said fee is not a duty on tonnage, nor an impost or duty on imports and exports, but on the contrary is an inspection fee in a reasonable amount assessed under the inspection laws of the State of Florida and under the police powers of said State; and that the services rendered in protecting the shipping using the harbor in all reasonable matters of health regulation and regulating the harbor and the use of private wharves and docks is a reasonable exercise of the police power of the State and adds to the safety, health, comfort and convenience of the plaintiff and all those using the Port of Jacksonville.

"8. The defendant further shows this Honorable Court that the terms of Section 3 of Chapter 3752, Acts of 1887, being Section 2499, Revised General Statutes of Florida, this defendant is *ex officio* a member of the Board of Pilot Commissioners and of Port Wardens of the Port of Jack-

sonville, and he is charged by said statute with the duty to carry out the rules and regulations of said Pilot Commissioners and Port Wardens, and by virtue of said office the defendant actually has charge of and is under the duty to enforce police measures as to the shipping operated by the plaintiff and to control the said shipping in all matters relating to the health and convenience of said port as hereinabove set forth in this answer."

It will be noted that the answer does not expressly allege that the Board of Port Wardens and Pilot Commissioners have established rules within their jurisdiction, as they are given authority to do under Section 3909, Comp. Gen. Laws, which section also makes it the duty of the Harbor Master to act in accordance with such rules. It is only by inference from the allegations in the answer as to the Harbor Master's duties that the answer contains anything to show that such Board has adopted any regulations whatsoever. As to the powers and duties of the Board of Pilot Commissioners, see Sections 3869-3893, Comp. Gen. Laws, particularly Section 3881, which gives the Board power to make and promulgate rules and regulations for the government and protection of the port. Section 3882, Comp. Gen. Laws, provides that said Board shall take such steps as may be necessary to detect violation in the ports or waters within their jurisdiction of the laws for protection of ports, bays, harbors, and rivers; and Section 3886 C. G. L. gives such Board full power to make such rules and regulations for their own government and the discharge of their duties "under this Chapter" as they may deem necessary and proper, and provides that they shall keep an office in the port or city for which they are appointed. Section 3869 C. G. L. provides among other things, that it shall not be lawful for any person to discharge or cause to be dis-

charged or deposited in the tide or salt waters or any port or harbor or river of the State any ballast or material of any kind other than clear stone or rock which shall be discharged only in the construction of enclosures in connection with wharves, piers, jetties, permanent bulkheads, etc., and Section 7797 prohibits the obstruction of navigable water courses.

Section 3905, Comp. Gen. Laws, makes it the duty of every master of any vessel arriving at the ports in this State to report to the Harbor Master for a station or for a berth at the wharves, and that the Harbor Master shall regulate and station and assign berths at the wharves to such vessels, and to cause to be removed all vessels not employed in receiving or discharging their cargoes to make room for such others as require to be more immediately accommodated for such purpose, and that it should be the duty of such Harbor Master to be present at all times, either in person or by deputy, to facilitate them by stationing or assigning berths at the wharves to vessels arriving at the ports and to prevent confusion and delay. The Harbor Master is given full power to determine how far and in what instance it is the duty of masters of vessels to accommodate each other in their respective situations.

This particular provision of the statutes may have little application to the plaintiff, who owned its own wharf, and yet it may be that the orderly berthing of vessels at other wharves, or the stationing of vessels elsewhere in the port, might well operate to benefit even vessels using private wharves by keeping the lanes of traffic open and facilitating the movement of all vessels using the port. Thus in Section 3912, it is made the duty of the master of every vessel arriving in port to apply to the Harbor Master or one of his deputies for a station in the stream or a berth at

the wharves, and that the Harbor Master or his deputy shall forthwith station such vessel so as to best facilitate the loading or discharge of such vessel, and at the same time interfere as little as possible with other vessels in the vicinity. However, in this connection it is added, that in assigning berths at wharves the Harbor Master shall conform in every instance to the wishes of the managers of such wharves as to their location at the same.

It is also, by Section 3911, made the duty of the Harbor Master, or one of his deputies, to board every vessel entering the port, after such vessel had been released by health authorities of the port, to demand of the master the certificate of the vessel's release of such health authorities, and to deliver the same within twenty-four hours to the Secretary of the Board of Health.

Section 3906 and 3914, Comp. Gen. Laws, one section being derived from the Act of 1903 and the other from the Act of 1887, provides that the Harbor Master shall receive from the master, owner or consignee of vessels coming into port, for the services rendered by himself or deputies, "under the provisions of this Article," not exceeding the sum of $20.00 for each vessel, according to the amount and value of the services rendered.

In the case of Webb v. Dunn, above referred to, decided by this Court in 1882, it was held that Chapter 3159 of the Laws of 1879, being an Act to Amend Section 4 of an Act to establish the office of Harbor Master for the Port of Pensacola, approved December 8, 1866, providing that the Harbor Master make demand for every vessel that may enter the port and load or unload, or make fast to any wharf, certain fees whether earned by any service rendered to any such vessel or not, is a law imposing a tax upon such vessels or their owners, and a regulation of commerce

within the terms of the 3rd paragraph of Section 8, Art. I, of the Constitution of the United States, which grants to Congress the power to regulate commerce with foreign nations and among the several states, and that said Act is therefore unconstitutional and void.

The fees provided for in that Act were "for any vessel drawing less than 10 feet, the sum of $5.00; and for any vessel drawing more than 10 feet, the sum of $1.00 for each additional foot." In the able opinion of Chief Justice RANDALL, in the case just cited, the Court reviewed several of the leading Federal cases on this subject, among them Steamship Co. v. Port Warden, 6 Wall., 31, 18 L. Ed. 749; Cannon v. New Orleans, 20 Wall., 577, 22 L. Ed. 417; and Inman Steamship Co. v. Tinker, 94 U. S. 238 (4 Otto) 24 L. Ed. 118.

It will be observed that the Act passed on in Webb v. Dunn provided for the payment of the fees whether any service was rendered or not, whereas under the statute here relied on by the appellant, the fees are based on services rendered by the Harbor Master or his deputies, not exceeding the sum of $20.00, according to the amount and value of the services rendered. It is true, this statute does not require any element of contract with reference to the services rendered, but we apprehend that this is not necessary in cases where the services rendered are in connection with the proper policing and protection of the port for the adequate protection and convenience of all vessels using the port, "according to the amount and value of the services rendered." It will be observed that the bill does not allege that the fee of $10.00 was an unreasonable charge against the appellee or its vessels, but the contention is that it is a tax on tonnage, or a regulation of interstate commerce, beyond the power of the State to impose.

In Inman S. S. Co. v. Tinker, *supra,* it was held that tonnage duties are duties upon vessels in proportion to their capacity. However, in the case of Steamship Co. v. Port Wardens, *supra,* it was said that the tax of $5.00 imposed by the Act of Louisiana was "in the fair sense of the word, a duty on tonnage."

But in that same case it was also said that while the power to regulate interstate and foreign commerce is vested in Congress, and that no State without the consent of Congress can lay any duties on imports or exports, except what may be absolutely necessary for executing its inspection laws, or any duty of tonnage, yet it was also said that:

"At the same time it was not intended to interfere with the exercise of State authority upon subjects properly within State jurisdiction. The power to enact inspection laws is expressly recognized as not affected by the grant of power to regulate commerce. And many other powers, the exercise of which may, in various degrees, affect commerce, have always been held not to be within the grant to Congress. To this class it is settled belong quarantine and other health laws, laws concerning the domestic police, and laws regulating the internal trade of a State."

It is our view that the somewhat broad language used in some of the cases above cited has been considerably clarified and limited by the Supreme Court of the United States in the case of Gloucester Ferry Co. v. Commonwealth of Pennsylvania, 114 U. S. 196, 29 L. Ed. 158, which does not appear to have been brought to the attention of the court below. In the opinion by Mr. Justice FIELD, in that case, after reviewing the case of Steamship Co. v. Port Wardens, *supra,* with approval, upon the ground that that case was simply one of "a tax imposed upon the vessel for the navigation of the public waters of the State," and

as such an unlawful regulation of commerce and an illegal encroachment upon the powers of Congress, it was very aptly added:

"The cases where a tax or toll upon vessels is allowed to meet the expenses incurred in improving the navigation of waters traversed by them, as by the removal of rocks, the construction of dams and locks to increase the depth of water and thus extend the lines of navigation, or the construction of canals around falls, rest upon a different principle. The tax in such cases is considered merely as compensation for the additional facilities thus provided in the navigation of the waters. Kellogg v. Union Co., 12 Conn. 7; Thomas Bank v. Lovell, 18 Conn. 500; McReynolds v. Smallhouse, 8 Bush, 447.

"Upon similar grounds, what are termed harbor dues or port charges enacted by the State from vessels in its harbors, or from their owners, for other than sanitary purposes, are sustained. We say for other than sanitary purposes, for the power to prescribe regulations to protect the health of the community and prevent the spread of disease is incident to all local municipal authority, however much such regulations may interfere with the movements of commerce. But independently of such measures the State may prescribe regulations for the government of vessels whilst in its harbors; it may provide for their anchorage or mooring, so as to prevent confusion and collision; it may designate the wharves at which they shall discharge and receive their passengers and cargoes, and require their removal from the wharves when not thus engaged, so as to make room for other vessels. It may appoint officers to see that the regulations are carried out, and impose penalties for refusing to obey the directions of such officers; and it may impose a tax upon vessels, sufficient to

meet the expenses attendant upon the execution of the regulations. The authority for establishing regulations of this character is found in the right and duty of the supreme power of the State to provide for the safety, convenient use and undisturbed enjoyment of property within its limits; and charges incurred in enforcing the regulations may properly be considered as compensation for the facilities thus furnished to the vessels. Vanderbilt v. Adams, 7 Cow. 351.

"Should such regulations interfere with the exercise of the commercial power of Congress, they may at any time be superseded by its action. It was not intended, however, by the grant to Congress, to supersede or interfere with the power of the States to establish police regulations for the better protection and enjoyment of property."

In the case Lindsay & Phelps Co. v. Mullen, 176 U. S. 126, 44 L. Ed. 400, it was held that a lien given by a State statute on logs out in another State for surveying and scaling them by the surveyor general of the State while in a log boom, does not constitute a burden on interstate commerce, but is a lawful charge imposed by the State for furnishing additional facilities for navigation of a waterway, which constituted, not a burden, but an assistance to navigation.

See also Morgan's R. R. and S. S. Co. v. Louisiana, 118 U. S. 455, 30 L. Ed. 237.

In the case of Inman Steamship Co. v. Tinker, *supra,* an Act of the State of New York imposing a tonnage duty of so much per ton on all vessels entering the port of New York, or making fast to any wharf therein, was declared unconstitutional. In that case Mr. Justice SWAYNE said:

"It does not advance the argument in behalf of the appellee to maintain that the regulations prescribed by the

Act are necessary and proper in the port for which they are provided. It is not our purpose to examine them, except as to the proposition in hand. It may be that, aside from the imposition of this tax, they contain nothing exceptionable, and that in all other respects they are wise and well considered. Similar provisions, varying according to local circumstances, exist at all important points throughout the world whither marine commerce finds its way. They are indispensable to those engaged in that business. They fence out many evils, and promote largely the convenience and welfare of those engaged in this field of enterprise. Perhaps it is hardly too strong language to say, they are well nigh vital to commerce itself. It may be conceded, also, that foreign steamships and other vessels visiting the ports of a State for business purposes may be made liable by the laws of such State for all reasonable and proper port charges. This is but a fair return for the benefits received. But such charges must not be repugnant to the Constitution of the United States. Any conflict is fatal to them. The warrant for such competent legislation may be found in that immense mass of police and other powers which the State originally possessed, which they have not parted with, and which still belongs to them; or it may in some cases be found among those which the States may exercise, but only until Congress shall see fit to act upon the subject. The authority of the State then retires, and lies in abeyance until the occasion for its exercise shall recur. * * *

"The State, in passing this law imposing a tonnage duty, has exercised a power expressly prohibited to it by the Constitution. In that particular the law is, therefore, void. * * *

"How the charges, which it is conceded the State may

impose, must be shaped in order to be valid, is a subject which it is not within our province to consider, and in regard to which it would not be proper for us to express any opinion."

This principle finds some analogy in the motor vehicle cases decided more or less recently by the Supreme Court of the United States. Thus, in Sprout v. South Bend, 277 U. S. 163, 48 S. C. 502, 72 L. Ed., 833, it was held that, in the absence of Federal legislation governing the subject, the State may impose upon vehicles using its highways exclusively in interstate commerce non-discriminatory regulations for the purpose of insuring safety and convenience, such a license fee no larger in amount than is reasonably required to defray the expenses of administering the regulations, and may delegate this power to municipalities. And in Sproles v. Binford, 286 U. S. 374, 52 S. C. 581, 76 L. Ed. 1167, it was held that a State statute limiting the net load permissible for trucks operated upon the public highways is not, in the absence of national legislation on the subject, repugnant to the commerce clause of the Federal Constitution. And in Michigan Public Utilities Co. v. Duke, 266 U. S. 570, 45 S. C. 191, 69 L. Ed., 445, a reasonably graduated license fee imposed by a State on motor vehicles used in interstate commerce, does not constitute an unlawful burden on such commerce.

Our conclusion is that statutes authorizing the assessment and collection of the fees herein sought to be enjoined, when considered in connection with the other statutory provisions above referred to, and the factual allegations contained in the answer, do not deprive the appellee of any of its rights under the Federal Constitution, nor impose any tonnage duty; nor do the statutes now appearing as Sections 3902 to 3916 C. G. L. inclusive, conflict with any

of the provisions of the Federal Constitution, or tran-. scend in any way the reasonable exercise by the State of its police powers—not as a burden upon interstate or foreign commerce, but as is the case here, as a distinct aid to commerce in general. Insofar as some of the expressions contained in the opinion in the case of Webb v. Dunn, *supra,* are inconsistent with the conclusions hereinabove reached, that case must be, to that extent, and the same is, hereby modified.

The decree of the court below is accordingly reversed and remanded with directions to dissolve the injunction granted and to dismiss the plaintiff's bill.

Reversed and remanded with directions.

WHITFIELD, P. J., and BUFORD, J., concur.

DAVIS, C. J., and TERRELL, J., concur in the opinion and . judgment.

## ON REHEARING.

PER CURIAM.—On July 23, 1934, the decree of the Circuit Court was reversed with directions to dissolve the injunction granted and to dismiss the complainant's bill of complaint. Afterward, upon petition of appellee, a rehearing was granted and the cause was argued before the Court *en banc* in view of the constitutional questions raised and resolved against appellee in this Court's opinion and judgment of July 23, 1934.

Upon full consideration after rehearing and reargument, a majority of the Court adhere to the opinion that the Florida statute (Sections 3902-3916 C. G. L., 2492-2506 R. G. S.) is not violative of the Constitution of the United States in the particulars complained of in the bill of complaint, and that therefore the opinion and judgment of this Court heretofore adopted and entered on July 23, 1934,

should be, and the same is hereby reinstated and made the opinion and judgment of this Court on rehearing. See Clyde Mallory Lines v. State, *ex rel.* State Docks Commission (Ala.) 159 Sou. 53.

But in so holding a majority of the Court do not mean to intimate that the compensation authorized by Section 3906 C. G. L., 2496 R. G. S., can be demanded or collected from the master, owner or consignee of a vessel coming into port where the Harbor Master has failed to perform any of the duties cast upon him by Section 3905 C. G. L., 2495 R. G. S., either in person or by deputy, so as to entitle him to demand and collect the compensation provided by Section 3906 C. G. L., *supra*. Defenses to unjust claims to compensation, however, should be appropriately asserted as a defense to any action brought to collect same.

Judgment of reversal adhered to on rehearing and cause remanded with directions to dissolve the injunction and dismiss the bill of complaint.

WHITFIELD, C. J., and TERRELL, BUFORD and DAVIS, J. J., concur.

ELLIS and BROWN, J. J., dissent in part.

BROWN, J. (dissenting in part).—On this rehearing, certain State and Federal statutes are brought to our attention by appellee which were not so brought on the original hearing, and which have convinced me that my original opinion should in some respects be modified and the judgment of the lower court should be affirmed instead of reversed. Of course, all persons, including judges, are presumed to know all the general statutes of their own State and those of the Federal government, but this presumption, which is one of those convenient fictions of the law which we have inherited from earlier days when statutes were fewer in number and which presumption still serves a use-

ful purpose, is nevertheless in some instances a violent one. It is is said that Lord Coke was wont to affirm that he should be ashamed not to be able to answer any question which turned upon common law principles without looking in a book, but that if he were asked any question concerning a statute, he would be ashamed to try to answer it without first reading the statute. So counsel in briefing cases, should not presume too far on this presumption that the judges know all the general statutes even of their own State, much less those of the Federal government. The "mystic cords of memory" sometimes slip, or get out of tune.

It is first contended that our former opinion was predicated, among other things, upon the assumption that the appellant Harbor Master was acting in the performance of duties for the enforced observance of quarantine and health measures, which powers and duties are by statute vested in and imposed upon the State Board of Health, its officers and employees, and cities and towns under the supervision of the State Board, and for the performance of which the Harbor Master is without authority and entitled to no compensation. Reference is made to Section 3148, 3150, 3151, 3152, 3153, 3160, and 3172, Comp. Gen. Laws, and to the case of Forbes v. Board of Health, 28 Fla. 26, 9 So. 862. Especial emphasis is laid upon Section 3152 concerning the inspection and quarantine of vessels by the State Board, which section provides that said Board shall charge and receive from vessels undergoing such inspection or sanitation such fee or fees as said Board may prescribe.

Appellee's assumption in this particular regard is not warranted by the language of the opinion, but is no doubt due to a confusion of some portions of the Harbor Master's answer, quoted practically in full in the opinion, with the

opinion itself. However, a perusal of the opinion will show that little if any weight was attached to that part of the answer. The writer was not entirely unfamiliar with the State statutes referred to. Be that as it may, it is certain that the Harbor Master cannot exercise the powers expressly vested by the statutes in the State Board of Health. Whether there are any powers or duties in this regard of a supplemental or ancillary nature which are cast upon the Harbor Master by the regulations of the Board of Port Wardens and Pilot Commissioners, and which it was within the statutory power of such Board to enact, it is hardly necessary for us here to consider, for, as pointed out in our original opinion, no such regulations are set forth in the answer, except perhaps by inference, and a pleading must be construed rather strictly against the pleader. As to the powers of such boards of pilot commissioners and port wardens, see Sections 3871-3893, 3909, C. G. L. Section 3886 expressly prohibits such boards from making any rules or regulations which shall conflict with those of the State Board of Health, and the statutes referred to do not appear to vest them with any positive powers whatever to make any regulations for the protection of the public health. In addition to the fees which the State Board of Health may charge for inspection and sanitation of vessels under Section 3152 C. G. L., another section, 3172, provides for the levy of an annual state-wide *ad valorem* tax to create a fund for the support of such board, and for the payment of the salaries of its officers and employees, and other necessary expenditures.

While Section 3909 C. G. L. makes the Harbor Master a member of the Board of Port Wardens and Pilot Commissioners of the port, and directs him to act in accordance with the rules of such board in all matters within their

jurisdiction, it is contended by appellee, and I think correctly so, that this does not entitle the Harbor Master to assess any fees against vessels (under Section 3914 C. G. L.) for the performance of any of the *police powers* for the protection of the port which are vested in the Board of Pilot Commissioners under Sections 3871-3892 C. G. L., and especially by Sections 3881 and 3882 C. G. L. It is pointed out that while Section 3881 gives each of such boards power to make "rules and regulations, in conformity with law" for the "government and protection of the port," and Section 3882 says that they shall take such steps as are necessary to detect violations in their ports or waters of the "laws" for the protection of ports, harbors, bays and rivers, and to cause complaint to be made for the arrest of offenders against such laws, and the same section provides that the Board of County Commissioners of the county shall audit and pay the expenses of the Board of Pilot Commissioners incurred under *that* section, which statute was held valid by this Court in County Commissioners of Escambia County v. Pilot Commissioners, 52 Fla. 197, 42 So. 697. It is further contended that for compensation for all services in this connection under both these sections, the Harbor Master, if he is entitled to any compensation at all, must look to the Board of Pilot Commissioners, and they in turn to the County Commissioners.

In reply to this, it may be said that Section 3881, adopted in 1879, deals with the Board of Pilot Commissioners to make "rules and regulations for the government and protection of the port,' whereas Section 3882, adopted in 1883, deals with the duty of such boards to detect and apprehend offenders against the "laws" for the protection of ports and harbors, and it is only as to such latter police duties, imposed by Section 3882, that the Board of Pilot Commis-

sioners must look to the County Commissioners for reimbursement for expenses thereby incurred, by the employment of officers to perform such harbor police duties. See Commissioners of Escambia County v. Pilot Commissioners, *supra*. The same rule laid down in that case would apply, even though the officer employed were the Harbor Master; hence the Harbor Master could not levy any fees therefor against vessels.

Some of the statutes above referred to, 3871, 3892 C. G. L., provide that such boards of pilot Commissioners shall receive certain fees for the examination and licensing of pilots, the registration and examination of vessels and their cargoes, etc., which are not material here.

This construction of the statutes still leaves the Board of Pilot Commissioners vested with the power, under Section 3881, to make and promulgate "rules and regulations, in conformity with law, for the government and protection of the port," and also leaves the Harbor Master bound, under Section 2909, to act in obedience thereto, provided such rules and regulations are "in conformity with law" and "within the jurisdiction" of the board to make.

It appears to be now conceded by both appellant and appellee that only Sections 3907-3916 C. G. L. apply to the port of Jacksonville, by reason of the number and tonnage capacity of the vessels which enter that port. So what was said about Sections 3902-3906 in our original opinion may be disregarded.

Just what rules and regulations the Board of Port Wardens and Pilot Commissioners are authorized to make, are not expressly set forth in the statute, but their nature and scope are limited by the statutes as follows: They must be (1) for the government and (2) protection of the port, and (3) they must be made and promulgated in conformity

with law. There is one regulation which is incidentally mentioned in said Section 3881, now apparently superseded by Acts of Congress, which provides that vessels of twenty tons and upwards, while lying at anchor, shall during the night show such lights as may be required "by the port regulations established for the port." This particular matter of lights on vessels has been covered by Sections 171-181, Title 33 U. S. C. A., which supersede the State statute insofar as there is any conflict. Section 3886 also gives such boards the power to make rules and regulations "for their own government and the discharge of their duties under this chapter, as they deem necessary and proper." Other sections require them to keep a true and complete record of all their acts and proceedings, and that "such books shall be open to the public inspection of any person interested therein."

Section 3909 makes the Harbor Master an *ex-officio* member of the Board of Port Wardens and Pilot Commissioners of the port for which he is appointed, and, as argued by appellee, he could not charge, as Harbor Master, any fees for services rendered by him in his capacity as a member of such board. But *if* he is required by the board, in his capacity as Harbor Master, to enforce such reasonable and necessary regulations as the board may have adopted for the protection and government of the port, or in carrying out his duties under Sections 3912, 3913 and 3915 C. G. L., insofar as the same are not in conflict with any State or Federal statute, and which amount to a service directly rendered to or for any particular vessel, he might be entitled to make a reasonable charge therefor, not based on tonnage, if the statute, Section 3914, is broad enough to cover it, and we think it is. It authorizes compensation for "services rendered by himself ·or deputy, under the pro-

visions of this article, not exceeding twenty dollars, according to the amount and value of the services rendered," and the "provisions of this article" includes not only the duties specifically imposed on the Harbor Master by Sections 3912, 3913, and 3915, but also include, in Section 3909, the provision above referred to, which requires the Harbor Master to "act in obedience to the rules of such boards in all matters within their jurisdiction." Of course, this would not authorize any rules imposing upon the Harbor Master any duties imposed by the statutes upon the board itself, such, for instance, as those imposed upon the board by Section 3882, hereinabove discussed, and various other sections contained in the same chapter. Simple harbor police service, to detect violations of the "laws" made for the protection of ports, such as Sections 3869-3870, making it unlawful to discharge any ballast or material of any kind than clear stone or rock, etc., must be provided by the Board of Pilot Commissioners and their expenses thus incurred paid for by the County Commissioners. But conceivably there are other matters not expressly covered by statutes which the Legislature had in mind when it gave boards of this kind authority to adopt rules and regulations for the government and protection of the port, and made it the duty of the Harbor Master to act in obedience thereto.

But as no such regulations are set forth in the pleadings, we must return to a consideration of the statutory duties of the Harbor Master. It is insisted that our former opinion was incorrect in assuming that Section 3911 C. G. L. was still in full force and effect. This is the section which makes it the duty of the Harbor Master, by himself or deputy, to board every vessel entering the port for which he is appointed, after such vessel has been released by the health authorities of the port, to demand of the master

the "certificate of the vessel's release by such health author-
ities, and to deliver the same within twenty-four hours to
the secretary of the Board of Health." It is asserted that
this section has been superseded and set aside by the
Federal statute of February 15, 1893, especially by Section
5 thereof, now appearing as Section 94 of Title 42, U. S.
C. A. This section of the Federal Act applies only to ships
sailing from foreign ports, and provides that the master of
such vessel shall deliver to the collector of customs at the
port of entry the bill of health required to be obtained from
the United States consular service at the port of departure,
and the certificate required by that Act to be obtained from
the health officer at the port of entry. It is argued that
the field of the delivery of health certificates has thus been
entirely occupied by paramount Federal law, superseding
Section 3911 of our Compiled General Laws above referred
to. While the writer was blissfully ignorant of the Federal
statute referred to when the original opinion was written,
we are by no means convinced that appellee's contention in
this regard is correct. This State statute was re-enacted
by the Legislature in the Revised General Statutes of 1920,
and the Legislature may well have intended that the State
health authorities, as well as the Federal collector of cus-
toms, at the port of entry, should have some showing that
the vessel's entry into the port would not be dangerous to
the health of our inhabitants. It will be noted also that the
Federal statute requires the delivery to the collector of cus-
toms the bill of health obtained under the Federal statutes
at the port of departure and the certificate required by such
statutes from the health officer at the port of entry, whereas
the State statute merely requires the Harbor Master to de-
mand the "certificate of the vessel's release" by the health
authorities of the port, evidently a different document from

either of those referred to in the Federal statute, and to deliver the same promptly to the secretary of the Board of Health. So it does not clearly appear that the State statute necessarily conflicts with the Federal statute. There is a Federal statute which is brought forward as Section 97 of this same Title 42, U. S. C. A., which tends to confirm this view. It reads as follows:

"Section 97. State health laws observed by United States officers. The quarantines and other restraints established by the health laws of any State, respecting any vessels arriving in, or bound to, any port or district thereof, shall be duly observed by the officers of the customs revenue of the United States, by the masters and crews of the several revenue cutters, and by the military officers commanding in any fort or station upon the seacoast; and all such officers of the United States shall faithfully aid in the execution of such quarantines and health laws, according to their respective powers and within their respective precincts, and as they shall be directed, from time to time, by the Secretary of the Treasury. But nothing in this section and Sections 88 to 91 and 112 to 114 of this title shall enable any State to collect a duty of tonnage or impost without the consent of Congress. (S. Sec. 4792.)"

The reasons underlying this Federal statute will be found in the old case of Morgan's Steamship Company v. La. Board of Health, 118 U. S. 455, 6 S. C. 1114, 30 Law Ed. 237. See also Minnesota Rate cases, 230 U. S. 352, 33 S. C. 729, 57 L. Ed. 1511, 1544.

Nor does it appear that Section 3911 C. G. L., in requiring this service on the part of the Harbor Master, was invading the powers vested in the State Board of Health by Sections 3148-3172 C. G. L. On the contrary, it was in aid of the exercise of such powers. Section 3911 seems

to have provided an additional safeguard to prevent the entry into the port or harbor of any vessel which had not been released by the health authorities. In view of the other Federal and State statutes, this additional safeguard may be, as is contended, an unnecessary one, but that is a matter for the Legislature to determine. As this State statute is not unconstitutional nor in conflict with paramount Federal statutes, this Court has no authority to strike it down.

It is further contended by appellee that Section 3912 C. G. L., making it the duty of the Harbor Master to station each vessel, arriving at the port, in the stream, or to a berth at the wharves, so as to best facilitate the loading or discharge of such vessel, and at same time interfere as little as possible with other vessels in the vicinity, but conforming to the wishes of the managers of such wharves as to the location of vessels at the same, is superseded and rendered inoperative by Section 409 of Title 33, U. S. C. A., which provides that, "It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft," etc., and by Sections 414 and 415 of the same title, giving the Secretary of War power, under certain circumstances, to remove water craft which obstruct navigation.

We fail to see wherein said Section 3912, C. G. L., conflicts in any way with the Federal statutes referred to. If it did so conflict our statute would to that extent have to give way, like the harbor rule in the case of the City of Norfolk, 266 Fed. 641, which case, contrary to two previous Federal decisions, held that the harbor rule in question in that case conflicted with the Federal statute above referred to, in that said harbor rule absolutely prohibited the anchoring of any vessel in the channel, regardless of whether or

not it was done in such a manner as would prevent or obstruct navigation.

However, in the earlier case of The Margaret J. Sanford, 203 Fed. 331, the State statute and harbor regulations were upheld, including the rule referred to in the case just above cited, and in the opinion it was said:

"The Federal statute referred to (Act of Cong. March 3, 1899, C. 425, 30 State 1152, 1153, 15, 16, and 17, U. S. Comp. St. 1901, pp. 3543) is quite comprehensive. Section 15 provides:

" 'That it shall not be lawful to tie up, or anchor vessels or other craft in navigable channels, in such manner as to prevent or obstruct the passage of other vessels or craft.' * * *

"The further suggestion is made that perhaps the State law has been superseded by the passage of the Federal legislation in question. This view is not without force, since ordinarily legislation by the Federal government upon a subject within its control is deemed exclusive of other authority, and this is clearly a subject within the dominion of Federal legislation. Gibbons v. Ogden, 9 Wheat, 1, 98, 196, 6 L. Ed. 23; Brown v. Maryland, 12 Wheat, 419, 446, 6 L. Ed. 678; Brown v. Houston, 114 U. S. 630, 5 Sup. Ct. 1091, 29 L. Ed. 257. While this is the general rule, the language and scope of the national Act would largely determine its purpose, and the intent of the Congress in passing it, and whether it was really meant that all local legislation should be set aside. Other sections of the Act under discussion, March 3, 1899, *supra,* having to do directly with rivers and harbors, the establishment of harbor lines, the granting of permits by the Secretary of War to build out into the navigable waters of the United States, have been the subject of review by the Supreme Court (Cum-

mings v. Chicago, 188 U. S. 410, 428, 430, 23 Sup. Ct. 472, 47 L. Ed. 525; Montgomery v. Portland, 190 U. S. 89, 23 Sup. Ct. 735, 47 L. Ed. 965) ; and the contention was there as here made, but the Court ruled that it was not the purpose of Congress to take away from the State the right to control its internal waterways and that the true meaning of the Act was that both governments should act conjointly therein, and hence that the legislation was not exclusive of the power and authority of the local governments in the premises. See, on this general subject, also, Gilman v. Philadelphia, 70 U. S. (3 Wall.) 713, 18 L. Ed. 96; Pound v. Turck, 95 U. S. 459, 462, 24 L. Ed. 325; Williamette Iron Bridge Co. v. Hatch, 125 U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629.

"This, although navigation may be said to be a subject more particularly within the Federal domain, in the view of the Court, is the proper interpretation of the sections of the Act under consideration here; and hence, that the two governments, and their officers, under existing legislation, can and should join or vie with each other in the effort to see that the same are enforced and respected, regarding these important matters."

See also The Strathleven, 213 Fed. 975, where it was held that a vessel anchoring in a place forbidden by a local law or custom, in case of collision, must take the consequences of her own unlawful acts.

In the case of United States v. St. Louis & M. V. Transp. Co., 184 U. S. 247, 46 Law Ed. 520, it was held that the anchoring of United States war vessels in the Harbor of New Orleans in total disregard of the usages and regulations of the port, constituted negligence which rendered the government liable for resultant damages. It was observed in that case that such a port required regulations

"suited to the local exigencies.' The particular Federal Act hereinabove quoted, had not, however, been adopted when this cause of action arose. But the later as well as the earlier Federal decisions recognize the general principle that large ports may require local regulations, and that those regulations, when otherwise valid, will not be held invalid unless they positively conflict with the laws or authorized regulations of the Federal government.

This general question of the respective powers of the State and National governments over navigable waters is discussed in Pembroke v. Peninsular Terminal Company, 108 Fla. 46, 146 So. 249.

What we have said in regard to the validity of Section 3912 C. G. L., pertaining to the stationing of vessels, applies with equal force to Section 3913, pertaining to the facilitation of the loading and unloading of vessels, by assigning them berths at wharves, and by requiring each to accommodate others needing more immediate accommodation, and to Section 3915 regarding the changing of the station of vessels at wharves when required. The statutes do not conflict with the Federal Constitution.

It is no doubt true that, as alleged in appellee's bill, no services have been or could be rendered by the Harbor Master directly to appellee's vessels in either of these respects, as appellee owns and uses its own private wharf for the stationing, berthing and accommodation of its vessels, as it has a legal right to do.

While Section 413 of U. S. C. A. makes it the duty of the Federal officials to enforce the penalties imposed for the violation of said Section 409 U. S. C. A., and certain other sections of the Federal statutes, such as Section 407, prohibiting the deposit of refuse into navigable waters, we fail to see, in the light of the above authorities, as well as

those cited in our former opinion, that this inhibits the State from passing, or enforcing such statutes as those above mentioned, which are designed to aid, rather than obstruct, the purposes of the Federal statutes. State measures, either by statute, or by authorized regulations by the port authorities, validly enacted for the proper regulation and protection of ports and harbors within the State, for the general benefit of both interstate and intra-state commerce, so long as they do not conflict or interfere with the valid and paramount statutes and regulations of the Federal government, or their enforcement, are not to be lightly cast aside. States' rights, equally with Federal rights, under the Constitution of the United States, must be respected and enforced by the courts.

We fully recognize the rule that where a State statute and a Federal statute, enacted within the power vested in the Congress by the national Constitution under the commerce clause, are in direct conflict, or so inconsistent as to expose the party affected to a conflict of duties, the State statute must yield. If the two statutes, operating upon the same subject matter prescribe different and inconsistent rules, one or the other must give way, and if the subject matter falls within that class of powers which the national Constitution has confided to the Federal government, the Federal statute must prevail. Gulf, etc., Ry. Co. v. Hefley, 158 U. S. 98, 39 Law Ed. 910.

As to those duties of the Harbor Master, alleged in the answer, which are supposed to be imposed by the regulations of the Board of Port Wardens and Pilot Commissioners, we are, for reasons already stated in this and our former opinion, not here called upon to deal. If any such rules and regulations were ever actually adopted and promulgated by such board, as to which the answer is silent,

appellee contends that they have in every instance been superseded by a very comprehensive set of regulations adopted by the national Congress, subsequently to the original adoption of said Florida statutes, and with which Federal statutes the writer was not familiar when the original opinion was written. Reference is first made, in this respect, to Sections 151 to 231, inclusive, being Chapter 3, Title 33, U. S. C. A., containing an elaborate system of statutory navigation rules for harbors, rivers and inland waters, rules regulating the displaying of lights and signals under various conditions, including also sound signals, steering and sailing rules, and almost every conceivable regulation for the prevention of collisions between vessels in harbors and inland waters. Then there is another elaborate group of statutes, Sections 401-437, regarding the protection of navigable waters and harbors, and river improvements generally, including powers for the establishment of harbor lines; prohibiting the deposit of refuse of any kind other than sewage in a liquid state, into navigable waters; prohibiting the obstruction of navigable waters by vessels or floating timber; duties of district attorneys and other officers in the enforcement of such provisions; removal of sunken water craft and grounded and other vessels obstructing navigation; prohibiting injuries to harbor improvements; imposing penalties for violations of various regulations; the "oil pollution Act" of 1924, being Sections 431-437, Title 33, U. S. C. A., prohibiting the discharge of oil into coastal or inland navigable waters in which the tide ebbs and flows; and authorizing the Secretary of War to make use of the officers, engineers and agents employed under his direction in the improvement of rivers and harbors, and the assistant engineers and inspectors under them, and officers of the Customs and Coastal Guard, to sue out

process and arrest persons violating any of said provisions of Sections 431-437. There are also Acts of Congress regulating the transportation by land or water of explosive and inflammable materials.

In view of these Federal statutes, it must be admitted that the scope of the powers and duties of boards of port wardens and pilot commissioners, and of harbor masters under the regulations of such boards, have been considerably whittled down. Yet "local exigencies" may, and in all probability do, require additional rules and regulations for the proper "government and protection of the port."

If it be admitted for the sake of argument that there may be rules and regulations which have been duly adopted by the Board of Port Wardens and Pilot Commissioners of the port of Jacksonville which attempt to impose upon the Harbor Master the various duties mentioned in the answer, and quoted in our former opinion, it appears that, in the light of what we have said above in regard to the State and Federal statutes alluded to, most of these duties referred to in the answer cannot lawfully be imposed upon the Harbor Master by such board, in such fashion as to give the Harbor Master any right to exact or charge any general fees against the vessels using the harbor for the performance of such duties. For, as we have seen, the administration and enforcement of quarantine and health protection measures have been entrusted to the State Board of Health. The answer does not expressly allege that any services have been rendered to appellee's vessels under Section 3911 C. G. L., which relates to boarding vessels after they have been released by the health authorities of the port for the purpose of demanding of the master of each vessel a certificate of such release, and delivery of same to the secretary of the Board of Health; but if the answer had so alleged, there

is serious doubt whether this could be considered as a "service rendered" to the vessel, but rather as a service rendered to or in behalf of the Board of Health, whose activities are supported in part by inspection and quarantine fees and in part by *ad valorem* taxes, and it may be that if the Harbor Master is entitled to compensation therefor, the Board of Health should provide such compensation. Nor is the Harbor Master entitled, under Section 3914, to charge against vessels any fees for the enforcement of the various Federal statutes above referred to, as said section expressly limits his rights to charge fees against vessels to "services rendered" *under the provisions of that particular article* of our Compiled General Laws (Sections 3907-3916) in which Section 3914 appears. Nor is the Harbor Master entitled to levy fees against vessels for detecting violations, within the port or waters under the jurisdiction of the Board of Pilot Commissioners, "of the laws for the protection of ports, harbors, bays and rivers," for, as we have seen, these harbor police duties are imposed upon the Board of Pilot Commissioners by Section 3882 C. G. L., which commands that the expense incurred by such board in the performance of such duty shall be audited and paid for by the Board of County Commissioners.

So on this record, and on the facts properly pleaded in the answer of the appellant Harbor Master, the only services which the Harbor Master can lawfully charge, under Section 3914, against the "master, owner or consignee of vessels coming into the port," are those rendered under Sections 3912, 3913 and 3915 C. G. L., which pertain to the stationing of vessels "in the stream, or to a berth at the wharves," so as to best facilitate the loading or discharge of such vessels, and at the same time interfere as little as possible with other vessels in the vicinity, but conforming

to the wishes of the managers of such wharves as to their location at the same; and to be present "to facilitate the loading or unloading of vessels by assigning to them berths at the wharves, and by requiring each to accommodate others needing more immediate accommodation; and, on application of the manager of a wharf, to change the location assigned, when required, after it has been stationed by the Harbor Master, for which changing of station it is expressly provided that the Harbor Master shall receive no compensation "unless the vessel requiring such change requires to be removed to another wharf or out into the stream."

As the appellee owns and uses its own private wharf, it is apparent that none of the services outlined in the preceding paragraph are needed or required by it, and the bill alleged that the appellee did not require, nor has it required, the services of the Harbor Master in connection with its vessels. This leaves as the sole question properly presented by this record, in the light of what has been said, the question as to whether or not the Harbor Master can charge fees against appellee's vessels, each time they enter the port, for services rendered to other vessels under the sections of the statute referred to in the preceding paragraph, upon the theory that such services render an indirect benefit to appellee's vessels by keeping the lanes of traffic open, so that appellee's vessels can without interference have safe and free access to and from its own wharf.

If the language of said Section 3914 is broad enough to authorize the charging of fees for such indirect or constructive services, where no services are directly rendered to the vessel against which such charge is levied, which is a very debatable question, the statute furnishes no standard or criterion by which the Harbor Master shall be guided in

levying such fees, except that the fee charged "for the services rendered by himself or deputy" shall be "according to the amount and value of the services rendered," and not exceeding $20.00 per vessel. In these circumstances the fee charged for such indirect general benefits is in the nature of a tax or charge, the amount of which should be fixed and imposed by law, or according to some standard fixed by law, and not left to the discretion or whim of the officer to assess at any amount from one cent up to $20.00 per vessel, which would leave open the door for discriminations and favoritism. See 61 C. J. 554. By what principle, rule or method, does the Harbor Master arrive at his opinion that such general services authorize a charge of $10.00 per vessel, and on what data is his calculation based? No statute or port rule has been brought before us which answers this query. We do not say that there has been any favoritism or discrimination shown in this case, for the fee for "general services," where no "special service" is rendered to the particular vessel, is, according to the pleadings, fixed by the Harbor Master in every instance at $10.00 for each vessel entering the port, regardless of size, value or tonnage; but this is no answer to the proposition just propounded, that charges of this nature should be authorized and fixed by law, or imposed by the Board of Pilot Commissioners, under the authority of and according to some rule fixed by law; all of which tends to lead us to the conclusion that the intent of said Section 3914 was to authorize the charging of fees by the Harbor Master only for services actually rendered by the Harbor Master or his deputy to the particular vessel against which the charge is made. As to such charges, for services rendered to the particular vessel, when made as the statute requires, "according to the amount and value of the services rendered,"

the general principles of law could be easily applied to enable the court or jury to ascertain the "amount and value" thereof in the light of the facts as to the actual services rendered to the vessel when the Harbor Master has to resort to the courts, under Section 3916, to enforce payment thereof. Another matter which tends to the same conclusion is that this Act of 1887 (Sections 3907-3916 C. G. L.) was adopted just few years after this Court decided the case of Webb v. Dunn, 18 Fla. 721, in 1882, which held invalid the fee section of the Pensacola Harbor Act because it prescribed fees whether earned by any service rendered to the vessel or not, whereas the Act of 1887 which we are here considering apparently attempted to meet the rule laid down in that case by prescribing Harbor Master's fees based on "services rendered by himself or deputy, according to the amount and value of such services." While in the case of Webb v. Dunn, the statute prescribed the fees to be charged, "for any vessel drawing less than 10 feet, the sum of $5.00; and for any vessel drawing more than 10 feet, $1.00 additional for each additional foot," which might be deemed a tax on tonnage, the decision that the fee section was unconstitutional and void was placed on the ground that these fees were prescribed against every vessel entering the port, and loading or unloading, or making fast to any wharf, regardless of whether any services were rendered to such vessel or not. In that case it was said:

"Every vessel is presumed to require the services of a pilot on approaching a port, and the laws of the States and of the Union require that the services of a pilot shall be tendered and paid for, for the protection of lives and property. The services of a Harbor Master may or may not be required for the landing or loading of a ship.

Clearly if a ship does not require these services, and does not demand them the imposition of fees, to be paid to an officer of the State, is simply a method of compulsory taxation, no specific service being performed. The element of contract is entirely absent.

"The tender of services by the Harbor Master is not required by the terms of the law, and hence his voluntary tender of services not required can give him no title to compensation."

The case of Webb v. Dunn, *supra,* followed and cited the case of Southern Steamship Co. v. Port Wardens, 6 Wall., 31 L. Ed. 749, which held that the Louisiana statute entitling the master and wardens of the port of New Orleans to receive a fee of $5.00 from every vessel arriving in that port, whether any services were rendered to the vessel or not, was repugnant to the Federal Constitution. It thus appears that even where the Legislature establishes the amount of the fee, unless it is of a kind which falls within the rule as to permissible "port charges" announced in the two cases quoted from in our original opinion, it is invalid as to ships to which no services are rendered.

See also, to like effect, Cox v. Lott, 12 Wall. 204, 20 L. Ed. 370; Peete v. Morgan, 19 Wall. 581, 22 L. Ed. 201; Cannon v. City of New Orleans, 20 Wall. 577, 22 L. Ed. 417; Harbor Master of Mobile v. Southerland, 47 Ala. 511. No charge can be made for the mere privilege of entering and anchoring in the port, but reasonable charges can be lawfully levied for Harbor Master's services actually rendered, and for quarantine service, such as the inspection and, when necessary, the sanitation of vessels. Morgan's R. R. & S. C. Co. v. Louisiana, 118 U. S. 455, 30 L. Ed. 237.

In view of the greatly narrowed base upon which the fees involved in this case must now rest, in consideration

of the pleadings in the case and the operative effect of the State and Federal statutes hereinabove reviewed and which were not considered in our original opinion, I think we should hold that such fees as are here involved ($10.00 on each vessel entering the port and mooring at the owner's private wharf, and to which vessel no direct services are rendered) must fall within the inhibition of the rule announced in our own case of Webb v. Dunn, *supra*, and the Federal cases above cited. The situation as now presented, under our present legislative set-up, and the facts alleged in the pleadings, would not bring this case within the operation of the principles announced in the case of Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 29 L. Ed. 158, and Inman Steamship Co. v. Tinker, 94 U. S. 238, 24 L. Ed. 118, quoted from in our original opinion. It is in this respect that I think my former opinion was erroneous, and should be modified.

We should therefore, as I see it, in view of the statutes brought to our attention on this rehearing, set aside our former judgment of reversal and now affirm the decree appealed from, with directions, however, to permit the appellant to amend his answer upon proper application so as, if he can, to meet the points of law made in this opinion. I am free to confess that I have reached this conclusion with considerable reluctance, as to do so requires some modification of my original opinion and a change in the conclusion therein arrived at. I still believe the State statutes applying to port of Jacksonville, 3907-3916 C. G. L., to be constitutional and valid, but that, in view of our State statute, placing the police duties upon the Board of Pilot Commissioners, and the Federal statutes above referred to, the Harbor Master, in this case, on the showing made by the pleadings, has no right under the Federal Constitution,

to charge any fees against particular vessels except, as the statute says, for "services rendered" to such particular vessels—that is, services rendered directly, and not constructively. Indeed, our statute, Section 3914, C. G. L., does not appear to contemplate any fee or charge for such constructive or indirect, or general services, or to furnish any criterion or standard to guide the Harbor Master in fixing them, if indeed such a power of taxation could be delegated to the Harbor Master, which I seriously doubt. The Harbor Master can under the statute, continue to charge vessels for services actually and directly rendered to such vessels, but if he is to be invested with power to levy a tax or charge upon all vessels entering the port. whether any services are directly rendered to them or not, further legislation would be necessary. Whether the' Legislature could, in any event, vest the Harbor Master with such power, without coming in conflict with Section 10 of Article I of the Federal Constitution, is a question we are not now called upon to decide. The present statute does not, to my mind, confer such a power.

ELLIS, J., concurs.